Present:  All the Justices

EARL CONRAD BRAMBLETT

                              OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record Nos. 981394                February 26, 1999
           981395

COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF ROANOKE COUNTY
                    Roy B. Willett, Judge

     Near 4:30 a.m. on Monday, August 29, 1994, Dorothy Ross

McGee was operating a vehicle through the Town of Vinton in

Roanoke County en route to her place of employment.  As she

drove past a two-story residence located at 232 East Virginia

Avenue, a white pickup truck operated by a white male, who was

alone, pulled onto the street from the area of the residence,

followed her briefly, and then "shot" past her, exceeding the

35-mile-per-hour speed limit.

     About the same time, Robert Scott Arney, travelling on

Virginia Avenue past the home, "noticed a large cloud of smoke

coming across the highway, very thick."  He determined the

residence was on fire and, using a radio, reported the fire to

authorities.

     Firefighters and police responded to the scene.  Upon

entering the burning residence, the authorities found four

bodies.  In the downstairs living room, the body of Teresa Lynn

Fulcher Hodges, an adult, was on a couch.  She had died from

ligature strangulation and had been doused with gasoline; the body was still burning when discovered.

The body of William Blaine Hodges, an adult, was on the bed in an upstairs bedroom.  He had died from a gunshot to the left temple.  His body was not burned.

The bodies of two children were on a bed in another upstairs bedroom.  Winter Ashley Hodges, 11 years of age, had died from two gunshots to the head; the muzzle of the weapon had been pressed against the skin when fired.  Winter's body had not been burned.

The body of Anah Michelle Hodges, three years of age, was in the same bed with her sister.  She had died from two gunshot wounds to the head; the muzzle of the weapon was within inches of the skin when fired.  Anah's body was "covered with soot" and had sustained "mild burns."

The mother and her daughters died during the early morning hours of August 29 and before the fire.  Blaine, the children's father, died "many hours before the female victims died," probably during the afternoon of Sunday, August 28.

On July 30, 1996, appellant Earl Conrad Bramblett, 54 years of age, was indicted for the following offenses:  Capital murder of Winter as part of the same transaction as the murder of Anah, Code § 18.2-31; the murders of Anah, Blaine, and Teresa, Code § 18.2-32; arson, Code § 18.2-77; and three counts of using a

2

firearm in the commission of the murders, Code § 18.2-53.1. Apprehended on July 30 in Spartanburg, South Carolina, the defendant waived extradition.  He was brought to Virginia and held in the Roanoke County jail.

Upon pleas of not guilty, the defendant was tried by jury during 14 days in October and November 1997.  In the guilt and penalty phases of the trifurcated trial, 98 witnesses testified.

The jury found defendant guilty of all charges, and during the penalty phase of the capital proceeding, fixed defendant's punishment at death based upon the vileness and future dangerousness predicates of the capital murder sentencing statute, Code § 19.2-264.4.

On December 16, 1997, following a post-trial sentencing hearing during which the trial court considered a probation officer's report, the court sentenced defendant to death for the capital murder.  The court also imposed sentences in the noncapital cases in accordance with the jury's verdicts as follows:  For each of the three first degree murder convictions, life imprisonment and a $100,000 fine; for the arson conviction, life imprisonment and a $100,000 fine (the court suspended the fine); and for the three firearms convictions, imprisonment for 13 years.

The death sentence is before us for automatic review under former Code § 17-110.1(A) (now § 17.1-313(A)), see Rule 5:22,

and we have consolidated this review with defendant's appeal of the capital murder conviction. In addition, by order entered July 13, 1998, we certified from the Court of Appeals of Virginia to this Court the record of defendant's appeals in the noncapital convictions (Record No. 981395). The effect of the certification is to transfer jurisdiction over the noncapital appeals to this Court for all purposes. Former Code § 17-116.06(A) (now § 17.1-409(A)). We have consolidated those appeals with the capital murder appeal.

As required by statute, we shall consider not only the trial errors enumerated by defendant but also whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. Former Code § 17-110.1(C) (now § 17.1-313(C)).

Initially, we shall dispose of two appellate issues that require no extended discussion. First, defendant contends the trial court erred by denying his motion to dismiss the capital murder indictment on the grounds that Virginia's death penalty statute is unconstitutional facially and as applied. He argues the statute dealing with the capital sentencing proceeding is unconstitutional because the aggravating factors "are vague and do not adequately channel the discretion of the jury." There is

4

no merit in this contention; we previously have rejected it in other cases and will not revisit the issue here. See e.g., Smith v. Commonwealth, 219 Va. 455, 474-79, 248 S.E.2d 135, 146-49 (1978), cert. denied, 441 U.S. 967 (1979).

Second, defendant contends the trial court erred "by failing to dismiss the indictments due to prosecutorial misconduct." According to Bramblett, the prosecutor withheld evidence in violation of court orders and asked questions during the trial "which he knew were objectionable." This assignment of error is procedurally defaulted because defendant did not ask the trial court to dismiss the indictments on the foregoing grounds. We do not entertain such issues that are raised for the first time on appeal. Rule 5:25.

A proper understanding of the remaining issues raised by defendant requires a brief summary of the facts. The evidence bearing upon the commission of these crimes is undisputed. During the guilt phase of the trial, Bramblett, who did not testify, presented only four witnesses. According to settled principles of appellate review, we will draw all reasonable inferences fairly deducible from the proven facts in the light most favorable to the Commonwealth.

The witness Arney, upon discovery of the fire, found handwritten notes on the rear and side doors of the home. The

5

note on the side door read "Had an emergency.  Back late Sunday, early Monday.  Teresa."

Upon arrival, the firefighters found fire throughout the structure.  Subsequent examination of the premises revealed the presence of petroleum accelerants and gasoline in various areas of the home.  Investigators also found that the telephone line had been cut.

Blaine and Teresa Hodges had attended an Amway conference in Charlottesville on the previous Friday night, leaving their children with a relative.  Blaine picked up the children on Saturday.  A friend spoke with Blaine by telephone about 5:00 p.m. on Saturday.  Later on Saturday, a friend telephoned the Hodges' residence but no one answered and an answering machine did not activate.  About 4:30 p.m. on Sunday, Teresa left a telephone message with a friend to arrange for the children's carpool on Monday, the first day of the school session.  The friend returned the call and talked with Teresa at a number Teresa furnished, which was for a public pay telephone located at a gas station on Virginia Avenue.

On Sunday, a neighbor saw Bramblett with Teresa and the children.  Bramblett, Teresa, and the children were seen together in a nearby national forest on Sunday afternoon; the forest ranger who saw them noted a black tailgate on Bramblett's white truck.

6

Another friend went to the Hodges' home at 7:15 p.m. on Sunday; he found the note on the door. Two other friends went to the Hodges' home at 8:45 p.m. on Sunday; they also found the note on the door. They observed the Hodges' two motor vehicles parked nearby, and the home was dark except for a light burning in the basement. They telephoned the house but received no answer and the answering machine did not take the call.

When the witness McGee observed the pickup truck with a "dark" tailgate leave the Hodges' home about 4:30 a.m. on Monday, she thought the truck's color was "sort of pinkish red." The jury was shown a video reenactment of a truck leaving the area where McGee had seen the truck; the reenactment included the burning halogen street lights present when McGee saw the truck. Referring to the video, McGee identified the truck as pinkish-red; that truck actually was white in color.[*]

At the time of these crimes, Bramblett, an acquaintance of the Hodges family for years, drove a 1972 model white pickup truck with a black tailgate. On the morning of the fire, Bramblett, an expert in silk screening, arrived at his workplace at 5:08 a.m. The workplace is 4.7 miles from the Hodges' home, a 12-minute drive in the early morning. Although defendant told

---

[*] The defendant assigns error to the trial court's action in admitting the video into evidence. The defendant did not object at trial to the playing of the video, and that failure to present the claim below bars review upon appeal. Rule 5:25.

his supervisor he had slept in his truck, his hair was neatly combed, he was freshly shaven, and his clothes were clean.

Bramblett drove past the Hodges' house at 8:30 a.m. on the morning of the fire; he did not stop. Later, he told his ex-wife about the fire and his belief that the police would "blame it on me."

A year prior to the fire, Bramblett had mailed two packages to his sister, who lives in Indiana. When these packages were opened, with the sister's permission, they were found to contain photographs of the Hodges children and 62 audiotapes of Bramblett's voice. On the tapes, Bramblett expressed a sexual interest in Winter Hodges and his belief that the child's parents were trying to "set him up" or entrap him in a sexual act with her.

A firearms expert testified about weapons, bullets, and casings found at the crime scene, and cartridges found in Bramblett's truck and a storage room he had rented. The expert opined that all the bullets recovered from the bodies had been fired from the same weapon, and that the rifling characteristics were consistent with weapons manufactured by QFI Arminius; an Arminius handgun, its barrel removed, was found in Blaine Hodges' bedroom. The fact that the barrel had been removed made it impossible for the expert to determine whether the pistol had fired any of the recovered bullets. The expert further opined

8

that one cartridge retrieved from the pistol at the scene and one found in Bramblett's truck were fired by the same firearm "to the exclusion of any other gun."

Another forensic scientist analyzed the chemical composition of the bullets recovered.  He testified that two of the bullets retrieved from the victims had the identical composition as a bullet found in the storage room.  A cartridge found on steps in the home was "analytically indistinguishable" from a cartridge found in defendant's truck.

A single pubic hair, described as a "characteristically Caucasian pubic hair," found on the bed between the two children, was determined to microscopically match a sample of Bramblett's pubic hair.  Bramblett is white, as were the victims.  DNA testing of the hair matched Bramblett.

Tracy Turner, a convicted felon who had been incarcerated with defendant at the Roanoke County jail testified about conversations he had with Bramblett about their addictions. Turner was addicted to drugs, and Bramblett said he was "addicted to young girls."

They discussed the charges the two men faced.  Bramblett "said that he had been caught with that girl, the young girl, and that he was caught downstairs with her and that the mother sent them upstairs — sent her upstairs and that he had choked the life out of her."  According to Turner, Bramblett said he

9

"walked around for a little bit and then he went upstairs. He said he went first to the man's room and then he went to the girls' room and he finished the business, took care of his business."

Bramblett also told Turner about a "forensic science book" from which he learned that "if you burn a house that it takes the rifling off of bullets, destroys hair samples and things like that." According to Turner, Bramblett said "that's the reason" he set fire to the Hodges' home. Bramblett told Turner his defense would be to suggest that the murders were "a drug hit." The defendant offered evidence that in the late 1980s, Blaine and Teresa Hodges consumed cocaine supplied by one Michael Fulcher, Teresa's half-brother. During that period Fulcher, who is presently incarcerated, was an undercover "cooperative witness" for the federal Drug Enforcement Administration. Blaine Hodges, a discharged postal service employee, was about to begin serving a six-month jail sentence in September 1994 for embezzlement of postal funds.

Initially, the police believed they were confronted with a murder/suicide, mainly because of the location of the weapon beside Blaine's body. This theory was abandoned quickly, however, when the results of the autopsies showed Blaine died hours before the rest of his family. The investigators also

10

quickly concluded that the fire was not accidental but was "a set fire."

The investigators wanted to talk to Bramblett because of his friendship with the Hodges family. About 5:00 p.m. on the day of the crimes, Bramblett came to the Vinton Police Department in response to a telephone request from Sergeant Mark A. Vaught, an investigator. Vaught told defendant the Hodges family had been killed in a fire. He did not mention how the victims died. At that point, defendant "seemed to appear to cry for a period of time." Vaught saw no tears. Bramblett then became angry and struck a file cabinet with his fist. A few minutes later, after Vaught had been joined by Barry Keesee, Special Agent, Virginia State Police, Bramblett, during a discussion "just about some general things" said, "Are you going to charge me with murder?"

Near 9:30 a.m. on Wednesday, August 31, William F. Brown, Jr., Assistant Chief of Police for the Town of Vinton, accompanied by Blaine Hodges' brother, talked with defendant at the nearby Apple Valley Motel, where Bramblett had rented a room. At first, Bramblett was calm and then he "became . . . very emotional. He started crying, shaking real bad. He blurted out, 'Go ahead and arrest me for murder.'" He said that he thought about suicide and that he actually had written a suicide note, according to Brown. After defendant "calmed

11

down," he promised to meet Brown at twelve noon at the Vinton Police Department, but he failed to appear.

We shall now turn to the remaining issues defendant raises on appeal. He contends the trial court erred by denying his pretrial motion for a change of venue, claiming extensive media coverage of the crimes and the charges against him. At Bramblett's request, the trial court took the motion under advisement pending selection of a jury. After the jury was selected, the court denied the motion. The court did not err.

There is a presumption a defendant will receive a fair trial in the jurisdiction where the crimes are committed. To overcome the presumption, a defendant must establish that the citizens of the jurisdiction harbor such prejudice against him that it is reasonably certain he cannot receive a fair trial. Kasi v. Commonwealth, 256 Va. 407, 420, 508 S.E.2d 57, 64 (1998). The decision whether to grant a motion for a change of venue lies within the sound discretion of the trial court. Id.

Here, 68 potential jurors were questioned. Only seven persons were excused because of fixed opinions about Bramblett that would have impaired their ability to serve impartially. The remaining persons were either unaware of media reports about the crimes or clearly stated their ability to put aside any information they may have heard or read.

The defendant did not overcome the presumption that he could receive a fair trial in Roanoke County.  There was no abuse of discretion by the trial court, especially given the ease with which the jury was selected.  See id. at 420-21, 508 S.E.2d at 64-65.

Next, defendant contends the trial court erred by finding that Bramblett was competent to stand trial.  We do not agree.

In November 1996, Dr. Evan S. Nelson, a clinical psychologist, was appointed by the trial court to serve as defendant's mental health expert for sentencing.  After Dr. Nelson interviewed Bramblett in jail, he became concerned about Bramblett's competency and suggested "that someone else perform an evaluation."

In January 1997, defendant filed a pretrial motion, pursuant to Code § 19.2-169.1, seeking a competency evaluation. The statute provides for such an evaluation if "there is probable cause to believe that the defendant lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense."

The court then appointed Dr. Joseph I. Leizer, a clinical psychologist, to conduct a competency examination and subsequently ordered defendant examined by Dr. Leigh D. Hagan, another clinical psychologist.

In May 1997, the trial court heard the testimony of the three psychologists and found that Bramblett was competent stating, "I have no question about his competency." Elaborating, the court said that "as a factual matter," the defendant "has substantial capacity to understand these proceedings against him, and he has substantial capacity to assist his Attorneys in his own defense." These findings are fully supported by the record.

Dr. Leizer diagnosed Bramblett with a "delusional disorder, persecutory type." He testified defendant had "paranoid delusions about how evidence is being manufactured against him."

The witness had interviewed Bramblett, listened to many of Bramblett's audiotapes, and read some of the many letters defendant had written. Defendant told the witness that the police had been "following him for years on end and looking for reasons to arrest him." Bramblett also believed, according to the witness, that the Hodges family "were involved in an undercover Police sting aimed at him" and that Winter was working undercover for the police, being "used by her parents for that purpose."

Dr. Leizer disagreed with Dr. Nelson's conclusion that Bramblett was incompetent. Dr. Leizer said that Bramblett was intelligent, witty, charming, verbal, and articulate; that he was able to relate information to his attorneys; that he

14

understood the charges facing him and the adversarial nature of the proceedings; and that he felt his attorneys were working hard for him, acting in his best interest.

Dr. Hagan agreed that Bramblett had a delusional disorder of the persecutory type. However, he considered Bramblett "meets the criteria for competence." He opined that defendant "is keenly motivated to work vigorously" with his attorneys on his defense, even though there are disagreements about "the principal focus of the defense." Dr. Hagan agreed that even though Bramblett "may have this paranoid delusion problem," it "does not render him incompetent or unable to cooperate with his Attorneys."

Next, defendant contends the trial court erred by denying his motion to suppress the audiotapes seized in Indiana and by admitting the tapes and their contents into evidence. When Bramblett's sister received the two packages in August or September 1993, she placed them, unopened, in a cabinet. Bramblett called his sister in 1993 and asked her to keep the boxes for him. He said, "In case anything happens to me, you'll have these."

On September 2, 1994, defendant arrived at the sister's home about 7:30 p.m. and left about 2:30 the next morning. He told the sister the police had questioned him about the crimes "and he felt that they were going to arrest him."

15

Bramblett related "he was with the mother and the two children and that they had gone for a long drive" the Sunday afternoon before the fire. When they returned to the Hodges' home from the drive, Teresa thought Blaine was not at home and "she wondered where he was at," according to Bramblett. Bramblett told his sister that he stayed at the Hodges' home until twelve midnight on Sunday.

The sister overheard Bramblett talking with another sister on the telephone; he stated that a Roanoke lawyer "had advised him since he hadn't been charged with anything to leave town and stay away from the police." Bramblett left the Indiana home abruptly when the sister thought she "saw a policeman outside."

After Bramblett left, the sister was reminded by her daughter about the boxes, which defendant had not mentioned. She "was afraid to keep the boxes" and "wanted to put these boxes in the hands of someone I could trust," according to the sister's testimony. The local sheriff was called. The sister and her husband executed a form consenting to the search of the boxes. She opened the boxes; the sheriff inventoried and photographed the contents.

In a pretrial motion, defendant moved to suppress the items obtained from the boxes. He asserted the sister lacked authority to deliver the packages to the police and that the police were required to obtain a warrant before opening the

16

boxes and examining the contents.  Defendant notes that the "tapes contain inculpatory evidence, i.e., Bramblett's inappropriate sexual thoughts and comments concerning Winter Hodges, and reflect Bramblett's belief that Blaine Hodges was involved in some sort of a conspiracy to frame Bramblett for something."

The trial court denied the motion, ruling there was "no evidence . . . to find a basis for unlawful search or seizure." The trial court was correct.

The sister had boxes addressed to her in her exclusive possession.  Bramblett imposed no restrictions with respect to the contents.  Thus, he had no remaining expectation of privacy in the items.

The Fourth Amendment does not restrict the authority of the police to accept evidence volunteered by private citizens.  See Ritter v. Commonwealth, 210 Va. 732, 739, 173 S.E.2d 799, 804 (1970) (package addressed to son voluntarily surrendered by mother in lawful control of it).  The sister's consent to the search of the boxes was clearly sufficient to authorize the sheriff's actions.

Next, the defendant contends the trial court erred by failing to grant his motion to suppress evidence obtained from the Apple Valley Motel and by admitting the evidence at trial. We do not agree.

When Bramblett failed to keep his twelve noon appointment at the Vinton Police Department on Wednesday, August 31, the police "had some concerns about his safety," given his earlier statements about suicide. Two officers returned to the motel, saw defendant's truck parked outside, knocked on the door to his room, and received no response. Then, they directed the owner to open the door to defendant's room. When the door was opened, one officer "stepped into the doorway" of the small room while the other officer stood "beside the door." Neither officer actually entered the room. At that time, Bramblett arrived in a taxicab and the officers "talked to him briefly."

Later that same day, two brothers of Blaine Hodges decided to go to the motel to talk with Bramblett, believing the police might "clear Earl." One of the men wore "a wire" at the suggestion of the police. While in the room, one brother "saw a .22 caliber bullet in the crease of [a] chair." The defendant's room was searched the next day pursuant to warrant.

The trial court found that the officers saw nothing as they were standing at the doorway to the room and that the warrantless opening of the motel room door was not grounds for suppression of the evidence seized pursuant to the later search warrant. The trial court ruled correctly.

Even assuming one of the officers briefly entered the room, as the defendant argues, no search was conducted and no evidence

18

was seized.  The subsequent search was conducted pursuant to warrant, which Bramblett never challenged.

Thus, the items seized under the warrant (certain writings, a detective magazine, a .22 caliber revolver, cartridges, and cartridge cases) were properly admitted in evidence.  Also, there is no merit to defendant's claim that the brother who wore the "wire" became "an agent of the Commonwealth."

Next, defendant contends the trial court erred by permitting Tracy Turner to testify at trial.  We reject this contention.

The prosecutor learned in January 1997 about Bramblett's statements to the felon Turner and planned to use him as a rebuttal witness at trial.  In October 1997, the prosecutor was advised that Bramblett "had figured out" Turner was going to testify.  Because of this development, the prosecutors believed Turner's "value as a rebuttal witness" was "diminished."  On "Thursday or Friday" before Turner testified on Wednesday, October 29, the prosecutor decided to call Turner as part of the Commonwealth's case-in-chief.  The prosecutor immediately disclosed Turner's name and his criminal record to the defendant.

Prior to Turner's testimony, defendant moved the court to bar Turner from testifying in the Commonwealth's case-in-chief because of late disclosure of Turner's criminal record.  The

trial court overruled the motion, stating the cross-examination would be delayed if the defendant chose, thus giving defendant's court-appointed investigator an opportunity to investigate Turner.

Immediately following Turner's testimony, defendant moved for a mistrial or for an instruction to the jury to disregard the testimony. Defendant asserted the prosecutor's failure to disclose Turner's criminal history violated the court's prior discovery orders and due process. The prosecutor had interpreted the discovery order to require disclosure of criminal histories of only case-in-chief witnesses, an interpretation endorsed by the trial court.

The trial court denied defendant's motion, accepting the prosecutor's representation concerning Turner. The court found that the prosecution "acted in a rather timely manner" in providing the criminal history to defense counsel. The court repeated its offer to grant defendant a delayed cross-examination "if you learn more" about Turner.

Of course, defendant was entitled to disclosure of exculpatory evidence, including evidence that impeaches the credibility of a prosecution witness, under Brady v. Maryland, 373 U.S. 83, 87 (1963). Robinson v. Commonwealth, 231 Va. 142, 150, 341 S.E.2d 159, 164 (1986). Evidence of the prior convictions of a witness is impeachment evidence under Brady.

20

See <u>Correll</u> v. <u>Commonwealth</u>, 232 Va. 454, 465, 352 S.E.2d 352, 358, <u>cert</u>. <u>denied</u>, 482 U.S. 931 (1987).

A defendant is entitled to "sufficient time to investigate and evaluate the evidence in preparation for trial." <u>Lomax</u> v. <u>Commonwealth</u>, 228 Va. 168, 172, 319 S.E.2d 763, 765 (1984). Here, the defendant had five or six days to investigate Turner's background. The defendant did not take advantage of the court's offer to postpone cross-examination, and he has not demonstrated any specific prejudice from the timing of the disclosure. If exculpatory evidence is obtained in time for it to be used effectively by the defendant, and there is no showing that an accused has been prejudiced, there is no due process violation. <u>Read</u> v. <u>Virginia State Bar</u>, 233 Va. 560, 564-65, 357 S.E.2d 544, 546-47 (1987). Hence, we hold the trial court did not err in its various rulings connected with Turner's testimony.

Next, Bramblett argues the pubic hair should not have been admitted into evidence because, first, "the evidence was not relevant," and, second, "the prejudicial effect of the evidence far outweighed any probative value."

There is no merit to this argument. The evidence was relevant to establish Bramblett's presence in the room where the children's bodies were found. This legitimate probative value far outweighed any incidental prejudice to defendant, and the

21

trial court did not abuse its discretion in admitting the evidence.

Next, defendant argues "the evidence was insufficient to support a conviction." We disagree.

The evidence supporting the convictions was overwhelming. It was gathered as the result of outstanding police work by town, county, state, and federal authorities.

A further recitation of the evidence we already have summarized is unnecessary. Indeed, we have not recited many facts pointing to defendant's guilt. It is sufficient to point out that Bramblett admitted to a jail inmate that he killed the victims and set the house on fire to destroy evidence. His many statements to police and others clearly show his guilty knowledge of the circumstances of the murders. He was with the Hodges family just prior to the murders. A truck closely resembling Bramblett's truck was observed leaving the scene as the fire was discovered. Bullets, shell casings, and cartridges found in Bramblett's possession matched similar items found in the home. Defendant's audiotapes and writings demonstrate the motive for the killings. His clothing, found at his workplace, was stained with the same accelerants used in the arson. A pubic hair matching Bramblett was found in the same bed as the children's bodies. Clearly, the jury was fully justified, based

22

on the evidence, in concluding defendant was the killer of the Hodges family and that he set their house on fire.

Finally, we have considered Bramblett's remaining assignments of error, and summarily reject them. He contends the trial court should have directed a verdict of life imprisonment during the penalty phase of the capital murder proceeding because the jury was misinformed about his prior record in several respects. Also, he contends the evidence was insufficient to support a finding of vileness and/or future dangerousness, and that imposition of the death sentence was arbitrary.

None of these contentions has any merit. We will respond, however, to defendant's claim that during the penalty phase "all of the factors used by the Commonwealth to enhance punishment concern events that occurred two decades before the current offenses and thus cannot be properly used as evidence of future dangerousness."

Defendant is referring to the testimony of women who lived in the Bedford-Roanoke area during the late 1970s. They testified they knew Bramblett during that period, when they were in their early teens. Each testified that Bramblett furnished them alcohol and drugs, after which he engaged in sexual intercourse with them, and that he required them to perform various sex acts upon him. The "time gap" of decades affected

only the weight to be accorded the evidence, not its admissibility. George v. Commonwealth, 242 Va. 264, 273, 411 S.E.2d 12, 18 (1991), cert. denied, 503 U.S. 973 (1992).

Moreover, the factual basis for defendant's contention is inaccurate. There was abundant other evidence presented on the question of future dangerousness including his recent conduct with 11-year-old Winter Hodges as well as his extensive and long-term planning and execution of the murders, all of which established his dangerousness.

Upon the question of disproportionality and excessiveness, we determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant. Kasi, 256 Va. at 426, 508 S.E.2d at 68. See former Code § 17-110.1(C)(2) (now § 17.1-313(C)(2)). In determining whether a sentence of death is excessive or disproportionate in a case like this, we examine the records of all capital murder cases previously reviewed by this Court in which the death sentence was based upon both the vileness and future dangerousness predicates, including capital murder cases where a life sentence was imposed. Jenkins v. Commonwealth, 244 Va. 445, 462, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993).

Based upon this review, we hold that defendant's sentence is not excessive or disproportionate to penalties generally

24

imposed by sentencing bodies in the Commonwealth for similar conduct. Generally, the death sentence is imposed for a capital murder when, as here, the defendant is convicted of a senseless murder of a young child, Clozza v. Commonwealth, 228 Va. 124, 138, 321 S.E.2d 273, 282 (1984), cert. denied, 469 U.S. 1230 (1985), and when the defendant is also convicted of killing other persons. See Goins v. Commonwealth, 251 Va. 442, 469, 470 S.E.2d 114, 132, cert. denied, 519 U.S. 887 (1996).

Therefore, we hold the trial court committed no reversible error, and we have independently determined from a review of the entire record that the sentence of death was properly assessed. Thus, we will affirm the trial court's judgment in both the capital murder case and the noncapital cases.

Record No. 981394 — Affirmed.
Record No. 981395 — Affirmed.

25