Present:  All the Justices

DANIEL LEE ZIRKLE

OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 002266                September 14, 2001

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PAGE COUNTY
John J. McGrath, Jr., Judge

As required by Code § 17.1-313, we review the sentence of death imposed upon Daniel Lee Zirkle.

I.

A grand jury in Page County issued an indictment against Daniel Lee Zirkle charging him with the capital murder of Christina Marie Zirkle pursuant to Code § 18.2-31(12), the "willful, deliberate and premeditated killing of a person under the age of fourteen by a person age twenty-one or older."  Prior to impaneling a jury on the morning of the scheduled trial, Zirkle's counsel informed the circuit court that Zirkle desired to enter a plea of guilty to the indictment and that he had instructed counsel not to present any evidence.  After consulting with counsel, Zirkle was arraigned, and he entered a plea of guilty to the indictment. Before accepting the plea of guilty, the circuit court considered a proffer of the evidence that the Commonwealth would have adduced during the guilt phase of the capital murder trial.  Zirkle concurred in the proffer.

After the circuit court conducted an inquiry incident to the tendered plea, the court concluded that Zirkle was mentally competent and fully capable of understanding the proceedings, and that he fully understood the nature and effect of his plea of guilty and the possible penalties that could be imposed upon him. The circuit court found that Zirkle's guilty plea was made freely, intelligently, and voluntarily. The court accepted Zirkle's plea and found him guilty of capital murder.

Pursuant to Code § 19.2-264.4, the circuit court proceeded with the penalty phase of the capital murder trial. At the beginning of the penalty phase, Zirkle's counsel informed the court that Zirkle had directed them not to present any mitigation evidence and that such direction was made against the advice of counsel. The circuit court asked Zirkle whether he understood that he could introduce evidence in mitigation and whether he had instructed his counsel not to present mitigation evidence. Zirkle responded, "I have."

The Commonwealth presented its evidence. After considering the evidence and a report prepared by a probation officer pursuant to Code § 19.2-299, the circuit court found that there is a probability that Zirkle would commit criminal acts of violence in the future that would constitute a continuing serious threat to society, and that his conduct in

committing the offense for which he was charged was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind and an aggravated battery to the victim. The circuit court entered final judgment fixing Zirkle's sentence at death.

Zirkle directed his counsel not to appeal the judgment of the circuit court. We entered an order that required the circuit court to conduct an evidentiary hearing to determine whether Zirkle's decision to waive his appeal was voluntary and intelligent. We also directed that the circuit court obtain Zirkle's written waiver under oath and file it with the transcribed record of the hearing in the event the court determined that Zirkle's decision was voluntary and intelligent. After conducting a hearing, the circuit court found that Zirkle "freely and voluntarily waived his right to appeal . . . and that [Zirkle] is fully aware of the consequences." The circuit court obtained an executed written waiver of Zirkle's right of appeal, signed by Zirkle in open court and under oath.

Even though Zirkle waived his appeal of right and directed his counsel not to participate in any appeals on his behalf, this Court must review the imposition of the sentence of death. We ordered that Zirkle's counsel file a brief and

3

present oral argument to this Court upon the matters contained in Code § 17.1-313, which states in relevant part:

> "A.  A sentence of death, upon the judgment thereon becoming final in the circuit court, shall be reviewed on the record by the Supreme Court.
>
> . . . .
>
> "C.  [T]he court shall consider and determine:
>
> "1.  Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
> "2.  Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Thus, we review the sentence of death to determine whether Zirkle's sentence was imposed under the influence of any arbitrary factor and whether his sentence is excessive or disproportionate.

## II.

In accordance with well-established principles of appellate review, we will review the evidence in the light most favorable to the Commonwealth, the prevailing party below.  Lenz v. Commonwealth, 261 Va. 451, 455, 544 S.E.2d 299, 301 (2001).  Barbara Jo Shifflett and Zirkle lived together in Rockingham County from 1992 until April 3, 1999. Barbara Shifflett was the mother of two children, Jessica L. Shifflett and Christina M. Zirkle.  Daniel Zirkle was Christina's biological father.

4

On April 3, 1999, Barbara Shifflett took her daughters to spend the night with her sister, Peggy S. Shifflett. When Barbara Shifflett returned to her home about 9:00 p.m., Zirkle was there in bed. "[H]e jump[ed] up out of the bed, and he bump[ed]" Barbara Shifflett in the chest and stated that he wanted his "f'ing girls home now."

Barbara Shifflett and Zirkle began to argue. She "picked up" a telephone and tried to call for help by "call[ing] 911." Zirkle "jerked" the telephone from her hand and pushed her against a fish tank. When Barbara Shifflett tried to use a different telephone to call for help, Zirkle "jerked the phone out of [her] hand" and shoved her against a sofa. Barbara Shifflett went into Jessica's bedroom and used a telephone to call the police.

After the police arrived, Barbara Shifflett left the home to spend the evening with her sister, Peggy Shifflett. Zirkle placed a telephone call to Peggy Shifflett's home, and Peggy Shifflett answered the telephone and hung up the receiver. Barbara Shifflett described this incident as follows:

> "And he called back, and [Peggy] told him that he could not speak to me, to please not call back. He calls again, and I told her to let me speak to him. So I spoke to him. And he said that he wanted his f'ing daughters home, and he wanted them home now. And I told him no, that we wasn't coming home. And he said . . . [h]e said, 'Do you want a war? Have a war. You'll pay, you f'ing b-.' "

5

Barbara Shifflett obtained a protective order which police officers served on Zirkle that night. The protective order directed Zirkle to stay away from Barbara Shifflett and the home he shared with her.

The next day, Barbara Shifflett and her sister went to Barbara's home to retrieve some items. While they were in the home, Zirkle, who had entered the house, attacked Barbara Shifflett. Eventually, Zirkle fled, police officers arrived at the home, and Barbara Shifflett obtained arrest warrants against Zirkle for assault and battery and violating the protective order. After the warrants had been issued, Zirkle continued to place telephone calls to Barbara Shifflett, and during one conversation, he told her that she "would be sorry, that [she] would pay."

Subsequently, Zirkle was arrested and convicted of assault and battery and violating the protective order. Zirkle was sentenced to incarceration in the Rockingham County Jail. Ricky Lee Dean, who was confined in the Rockingham County Jail with Zirkle, testified that Zirkle stated: "[H]e was going to take care of all three of them when he got out of there. If he couldn't have them, nobody else would. He said he was going to kill them, all three."

About 2:30 p.m. on August 2, 1999, Zirkle, who had been released from jail, placed a telephone call to Barbara

Shifflett while she was at work.  Shifflett testified:  "I was at work. . . .  At 2:30 [Zirkle] calls me and tells me to live in hell, bitch."

Around 4:30 p.m. that day, Barbara Shifflett left work to obtain another protective order from a magistrate.  When she returned to work that evening, Barbara Shifflett learned that Zirkle's mother had made an "urgent" telephone call to her. Barbara Shifflett called Zirkle's mother, who informed Barbara Shifflett that Zirkle "had Christina."  Barbara Shifflett immediately left work and drove her car home to check on Jessica, who had been "watching" Christina.  While en route to her home, Barbara Shifflett used her cellular telephone to call Jessica, but no one answered the telephone.

When Barbara Shifflett arrived at her home, she entered the house and began to search for Christina.  Barbara Shifflett "holler[ed]" for Christina and Jessica.  Barbara Shifflett went to Jessica's bedroom, and the door was closed. When she opened the door, Barbara Shifflett found Jessica's body on the floor.  Barbara Shifflett "called 911."  When police officers arrived at the Shifflett residence, they examined Jessica's body and informed Barbara Shifflett that Jessica was dead.  The officers also informed Barbara Shifflett that Christina had been killed.

Peter Monteleone, an investigator with the Page County Sheriff's Department, was dispatched to the Storybook Trail in Page County on August 2, 1999. He had been informed by the dispatcher that a 30-year-old male, who had threatened to commit suicide, "had taken his daughter and gone to the trail." As Monteleone walked down the paved trail, he observed that the wooden deck area at the end of the trail contained "fresh blood stains." Monteleone saw "the upper part of a male torso" and a child's leg. The child's body was lying face down on the male's chest, the male's left arm was over the child, and there was a knife lying "right off of [Zirkle's] right hand."

Monteleone determined that Zirkle was alive and kicked the knife away from his hand. Monteleone tried to determine whether the child had a pulse, and she did not. Monteleone observed wounds to Christina's body. Michael Todd Foltz, a member of a rescue squad, arrived at the scene, checked Christina's vital signs, and pronounced her dead. Zirkle, who had a self-inflicted wound to his neck, was transported to a hospital for treatment.

Detective Daniel Comer of the Rockingham County Sheriff's Department interviewed Zirkle. The defendant stated that he had taken a knife from his mother's home and that he used the knife to kill Jessica and Christina.

8

Ronald J. Jackson, an inmate who was incarcerated with Zirkle after Zirkle had been arrested for the murders of Jessica and Christina, gave the following testimony: "An officer came in, when Mr. Zirkle first entered into the pod. Maybe a week or two after he had entered, an officer came in to let [Zirkle] know that he was going to contribute to the car wash that was being given for his daughters' grave site and the stones. And as the officer came over and explained what he was going to do, Mr. Zirkle said, 'Well, tell that bitch I said checkmate.' And he ran his thumb across his throat, and looked dead at the officer."

Dr. Frances Patricia Field, the assistant chief medical examiner for the Northern Virginia Medical Examiner's Office, qualified as an expert witness on the subject of forensic pathology. She performed an autopsy on the body of Christina Zirkle.

Dr. Field testified as follows: "[Christina] had a superficial incised, or cut wound under her chin. She had a gaping incised stab wound on the front of her neck. She had some abrasions on the front of her left shoulder, or lower neck region; a bruise at the back of her right neck; a small bruise on her right abdomen; some abrasions, or scraping of the skin, on the right hand and right knee; and a bruise on

her lower right leg.  And there was a pressure mark on her left knee."

Field stated that the stab wound to Christina's neck extended "to a depth of approximately two and three quarter inches.  It went through the tracheal, or the air passage.  It also went between two cervical vertebrae, between the bony parts, and cut the spinal cord in half."  Dr. Field opined that this type of stabbing motion involved considerable force.  Dr. Field testified that Christina would have lived "for a very short period of time[,] [o]nly a few minutes" after this wound was inflicted.  The cause of Christina's death was the stab wound to the neck.  The stab wound to the neck involved cutting and stabbing motions, and the abrasions and bruises on the back of Christina's neck and the base of her head indicated that she struggled when Zirkle stabbed her with the knife.

Dr. William Massello, the assistant chief medical examiner for Western Virginia, qualified as an expert witness in the field of forensic pathology.  He performed an autopsy on Jessica Shifflett's body.  He testified that her body had five stab wounds to the neck.  Two wounds were on the left side and extended into the neck approximately three to five inches.  These wounds "cut through a major artery, a major vein, and the back portion of the windpipe in the front of the

neck.  And in doing so, they created . . . they would have caused a lot of external bleeding, bleeding into the windpipe, or the airway, and also bleeding into the supporting tissue and the muscles of the neck."

Jessica's body had two additional wounds on the front of the neck.  Those wounds extended "into the muscle of the neck, and into a glandular structure . . . called the thyroid gland, which regulates your metabolic rate."

When asked whether he was able to determine which of the five wounds would have been lethal to Jessica, Dr. Massello responded:  "I couldn't tell you which one.  But I can tell you that one of the two, or both on the left side of the neck, were terribly, terribly lethal, and either one of those wounds would have caused death within many seconds, or a few minutes, after being inflicted."  Dr. Massello testified that the types of injuries on the child's neck were consistent with the blade size and type of knife taken from Zirkle.

In 1988, Zirkle was convicted of armed robbery.  Nancy Berry, the victim of the robbery, testified that Zirkle entered a store where she was employed as a cashier, displayed a butcher knife, and demanded that she "[g]ive [him] some money."  Berry gave Zirkle money from a cash register, and he left the store.  Zirkle pled guilty in 1999 to possession of marijuana and was convicted of that offense.  The Commonwealth

presented evidence that Zirkle had also threatened and abused members of Barbara Shifflett's family.

## III.

### Passion, Prejudice, and Proportionality

#### A.

Counsel for Zirkle state in their brief that "every death case contains an element of passion.  Counsel for Mr. Zirkle cannot point to any evidence in the record that would indicate that the Court was influenced by passion, prejudice or any other arbitrary factor.  Counsel for Mr. Zirkle ask the Court to review the proceedings . . . in considering this issue."

We have reviewed the record, and we find no evidence that Zirkle's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.  We also observe that even though it was not required to do so, the circuit court, on several occasions, informed Zirkle that he was entitled to offer evidence in mitigation, but Zirkle refused to permit his attorneys to present such evidence.

#### B.

The test of proportionality that we apply is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes."  Smith v. Commonwealth, 239 Va. 243, 271, 389 S.E.2d 871, 886 (quoting Stamper v. Commonwealth, 220 Va. 260, 284, 257 S.E.2d 808, 824

(1979), cert. denied, 445 U.S. 972 (1980)), cert. denied, 498 U.S. 881 (1990).

Zirkle's counsel state that since they were "prevented by Mr. Zirkle from presenting any evidence in mitigation, Counsel for Mr. Zirkle cannot point to any evidence in the record that would indicate that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

We have examined the records in all capital murder cases reviewed by this Court since the adoption of Code § 17.1-313. Applying the test of proportionality, we hold that the sentence of death imposed upon Zirkle is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant.

In Buchanan v. Commonwealth, 238 Va. 389, 384 S.E.2d 757 (1989), cert. denied, 493 U.S. 1063 (1990), we affirmed the sentence of death imposed upon Douglas Buchanan who was convicted of capital murder in violation of former Code § 18.2-31(g), now Code § 18.2-31(7), for killing his father in the same transaction in which he killed his two half-brothers, and stepmother.  In Davidson v. Commonwealth, 244 Va. 129, 419 S.E.2d 656, cert. denied, 506 U.S. 959 (1992), we affirmed the sentence of death imposed upon Mickey Wayne Davidson who used a crowbar in the capital murder of his wife and two

13

stepdaughters.  We recognize that the sentences of death imposed upon the respective defendants in Buchanan and Davidson were based on the vileness predicate and that Zirkle's sentence of death was based upon both vileness and future dangerousness.  This Court, however, has approved sentences of death in comparable cases involving both the future dangerousness and vileness aggravators.  See Walker v. Commonwealth, 258 Va. 54, 515 S.E.2d 565 (1999), cert. denied, 528 U.S. 1125 (2000); Bramblett v. Commonwealth, 257 Va. 263, 513 S.E.2d 400, cert. denied, 528 U.S. 952 (1999); Beck v. Commonwealth, 253 Va. 373, 484 S.E.2d 898, cert. denied, 522 U.S. 1018 (1997); Clagett v. Commonwealth, 252 Va. 79, 472 S.E.2d 263 (1996), cert. denied, 519 U.S. 1122 (1997); Goins v. Commonwealth, 251 Va. 442, 470 S.E.2d 114, cert. denied, 519 U.S. 887 (1996); Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2d 394, cert. denied, 510 U.S. 848 (1993); George v. Commonwealth, 242 Va. 264, 411 S.E.2d 12 (1991), cert. denied, 503 U.S. 973 (1992).

## IV.

Having reviewed the sentence of death pursuant to Code § 17.1-313, we decline to commute the sentence to imprisonment for life.  Accordingly, we will affirm the judgment of the circuit court.

Affirmed.

14