Present:   All the Justices

DANIEL LEE ZIRKLE
                         OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record Nos. 010227 & 010228     November 2, 2001

COMMONWEALTH OF VIRGINIA

             FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                      Porter R. Graves, Jr., Judge

     As required by Code § 17.1-313, we review the sentence of

death imposed upon Daniel Lee Zirkle.

                                I.

     A grand jury in Rockingham County issued three

indictments against Daniel Lee Zirkle charging him with the

following offenses:  the capital murder of Jessica Shifflett

"as part of the same act or transaction in which he

unlawfully, feloniously, willfully, deliberately and with

premeditation killed Christina Zirkle" in violation of Code

§ 18.2-31(7)[*]; the capital murder of Jessica Shifflett "within

the three year period in which he unlawfully, feloniously,

willfully and deliberately with premeditation killed Christina

Zirkle" in violation of Code § 18.2-31(8); and breaking and

entering in the daytime of a dwelling house with the intent to

commit murder while armed with a deadly weapon in violation of

Code § 18.2-90.

---

     [*] Zirkle was convicted of the capital murder of Christina
Zirkle and sentenced to death.  See Zirkle v. Commonwealth,
262 Va. 320, 551 S.E.2d 601 (2001).

On August 16, 2000, Zirkle's counsel informed the circuit court that Zirkle desired to enter pleas of guilty to the indictments and to request that the court impose upon him a sentence of death. Zirkle's counsel told the circuit court that they had discussed the pleas with Zirkle "in great length" and that they disagreed with him, but that he desired to enter the guilty pleas over their objections. Zirkle further advised his counsel that he would not permit them to participate in the penalty phase of the proceedings by presenting mitigating evidence.

The circuit court examined Zirkle extensively regarding counsel's representations to the court, which Zirkle confirmed. Zirkle was arraigned, and he entered pleas of guilty to the indictments. The circuit court considered a proffer of the evidence that the Commonwealth would have adduced during the guilt phase of the trial of the capital murder charges and the non-capital charge. Zirkle agreed with the Commonwealth's proffer.

The circuit court conducted an inquiry incident to the tendered pleas and concluded that Zirkle was mentally competent and fully capable of understanding the proceedings. The court also found that Zirkle fully understood the nature and effect of his guilty pleas and the possible penalties that could be imposed upon him. The circuit court found that

2

Zirkle's pleas were made freely, intelligently, and voluntarily. The circuit court accepted Zirkle's pleas and found him guilty of capital murder as charged in the indictments and guilty of breaking and entering with the intent to commit murder while armed with a deadly weapon. Zirkle received a life sentence for his conviction of breaking and entering with the intent to commit murder while armed with a deadly weapon, and even though he filed a notice of appeal from that conviction, he does not challenge that conviction or sentence on appeal.

Pursuant to Code § 19.2-264.4, the circuit court proceeded with the penalty phase of the capital murder trial. Zirkle instructed his counsel not to present mitigation evidence. The court directed Zirkle's counsel to prepare to present mitigation evidence in the penalty phase of the proceeding in the event that Zirkle subsequently changed his mind. Zirkle again instructed his counsel to refrain from presenting evidence in the penalty phase of the proceeding. The circuit court, on numerous occasions, asked Zirkle whether he desired to present evidence during the penalty phase of the proceeding, and on each occasion, Zirkle responded in the negative.

The Commonwealth presented its evidence. After considering the evidence and a report prepared by the

3

probation officer pursuant to Code § 19.2-299, the circuit court found that the Commonwealth had proven beyond a reasonable doubt that there is a probability based upon the evidence of prior history of the defendant and the circumstances surrounding the offense that Zirkle would commit criminal acts of violence that would constitute a continuing serious threat to society, and that his conduct in committing the offense was outrageously and wantonly vile, horrible and inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim, Jessica Shifflett.  The circuit court entered a final judgment fixing Zirkle's punishment at death.

Zirkle apparently directed his counsel not to appeal the judgment of the circuit court.  His counsel filed "a motion for direction and guidance" in the clerk's office of this Court.  We entered an order that required the circuit court to conduct an evidentiary hearing to determine whether Zirkle's decision not to pursue an appeal was voluntary and intelligent.  We also directed the circuit court to obtain Zirkle's written waiver under oath and file it with the transcribed record of the hearing in the event the court determined that Zirkle's decision was voluntary and intelligent.  After conducting a hearing, the circuit court concluded that Zirkle's "directions to his [c]ounsel not to

4

participate in the appeal process and his decision not to participate in the appeal process were intelligently, voluntarily, and knowingly made and that [Zirkle] is mentally competent to make the decision to waive his appeal rights." The circuit court obtained an executed written waiver of Zirkle's right of appeal, signed by Zirkle in open court and under oath.

Even though Zirkle waived his right of appeal and directed his counsel not to participate in any appeals on his behalf, this Court must review the imposition of the sentence of death. We ordered that Zirkle's counsel file a brief and present oral argument to this Court upon the matters contained in Code § 17.1-313, which states in relevant part:

"A.  A sentence of death, upon the judgment thereon becoming final in the circuit court, shall be reviewed on the record by the Supreme Court.

. . . .

"C.  [T]he Court shall consider and determine:
"1.  Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
"2.  Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Thus, we review Zirkle's sentence of death to determine whether it was imposed under the influence of any arbitrary

5

factor and whether his sentence of death is excessive or disproportionate.

II.

A.

The Proffered Evidence

Zirkle and Barbara J. Shifflett, who were not married, shared a residence together. In April 1999, the Juvenile and Domestic Relations District Court of Harrisonburg and Rockingham Counties issued a protective order that directed Zirkle to stay away from the residence he had shared with Barbara Shifflett. Zirkle was convicted of violating that order in May 1999 and was incarcerated.

On August 2, 1999, Barbara Shifflett left her home and went to her place of employment. Her daughters, Jessica Shifflett and Christina Zirkle, remained at the home. Christina Zirkle was the natural child of the defendant. Barbara Shifflett had instructed Jessica, who was 14 years old, to take care of Christina, who was four years old. Barbara Shifflett called her home several times that day to "check on" the children.

In the afternoon of August 2, 1999, Zirkle, who had been released from incarceration, placed a telephone call to Barbara Shifflett and stated, "[l]ive in hell, bitch," and he hung up the telephone. Barbara Shifflett became concerned,

6

and she went to a magistrate who issued an arrest warrant against Zirkle for violation of the protective order. Subsequently, Barbara Shifflett received a telephone call from the defendant's mother, JoAnn Zirkle, who informed Shifflett that the defendant had taken Christina from Barbara Shifflett's home.

Barbara Shifflett immediately left her place of employment and began to drive her automobile to her home. JoAnn Zirkle placed a "911 call" to emergency response personnel because she was concerned that the defendant had taken Christina Zirkle to an area in Page County called Story Book Trail.

When Barbara Shifflett arrived at her home, she entered the residence and began "crying out" for her daughters. She ran though the home screaming for her daughters, but she was unable to find them. Eventually, she found Jessica lying on the floor in a bedroom. Barbara Shifflett was unable to discern whether Jessica was "alive or dead." She observed what she thought was red paint on Jessica's arm, but she later learned that the liquid was actually Jessica's blood. Barbara Shifflett attempted to revive Jessica, but she was unable to do so. Barbara Shifflett ran out of her residence "yelling for help."

Officers from the Rockingham County Sheriff's Office arrived at Barbara Shifflett's residence to inform her that her other child, Christina, had been killed. Barbara Shifflett asked the officers to help Jessica, who had been stabbed in the throat. The officers tried but were unable to revive Jessica.

Christina's body had been found by a Page County sheriff investigator who had been dispatched to the Story Book Trail. Christina had sustained a large neck wound, and her body was lying on Zirkle's chest. A knife was lying near Zirkle's extended arm. The investigator kicked the knife away from Zirkle's hand because the officer was concerned with his safety.

Zirkle was subsequently transported to a hospital where he told a psychiatric medical resident that he killed Christina and Jessica. Zirkle also admitted "his role" in the murders to two detectives who interviewed him.

B.

Evidence Adduced During the Penalty Phase

The Commonwealth adduced the following evidence during the penalty phase of the proceedings. Barbara Shifflett testified that Zirkle had abused her physically and mentally. For example, in December 1998, Zirkle shoved her against a

refrigerator.  In January 1999, Zirkle pushed her against a cabinet, and she fell and cut her elbow.

In the spring of 1999, Zirkle became angry because Christina and Jessica had spent the night with their cousins. Zirkle became enraged and pushed Barbara Shifflett "into [a] sofa."  When Shifflett tried to place a telephone call for help, Zirkle pushed her against a fish tank.  During that incident, Shifflett was able to place a telephone call to police officers who responded to the residence.  She left the residence to spend the night with her sister, Peggy Shifflett. Zirkle repeatedly placed telephone calls to Peggy Shifflett's house, and he told Barbara Shifflett that he "wanted [her] and the girls home, f'n girls home."  When Barbara Shifflett responded that she did not intend to return to the home, Zirkle stated, "you want a war . . . you'll have a war you f'n bitch, you'll pay."  Even though a protective order had been entered prohibiting Zirkle from entering the residence he shared with Barbara Shifflett, when she returned to her home the following day, the defendant had entered the home, hidden in the shower, and attacked her.

Subsequently, Barbara Shifflett told the defendant during a telephone conversation that they should terminate their relationship.  Zirkle responded that she would "pay for breaking up his family."

Lieutenant Daniel Comer, who is employed by the Rockingham County Sheriff's Department, testified that Zirkle admitted he had called Barbara Shifflett between the time he killed Jessica and the time he killed Christina and told Barbara Shifflett, "[l]ive in hell, bitch, live in hell."

Ricky L. Dean was in jail with Zirkle before Zirkle killed Jessica and Christina in August 1999. Zirkle had a conversation with Dean. Zirkle told Dean that when Zirkle "got out he was going to kill all three of them, if he couldn't have them nobody else would."

Frances Patricia Field, a forensic pathologist, performed an autopsy on the body of Christina Zirkle. She testified that when she examined Christina's body, she noticed bruised areas on the back of Christina's head, at the base of her neck, and on her back. The bruising on the back would have been caused by blunt force injuries. Christina sustained an injury to her left shoulder which was consistent with a struggle.

Christina's body had a large wound on the front of the neck and chest. According to Dr. Field, the wound was "both a combined stab wound and incised wound. Also there's some irregularity of the edges of the wound which indicate some turning of the sharp instrument which caused the wound." Dr. Field also testified that the wound contained jagged areas

10

which could be consistent with either "the turning of [a] blade" or with movement by the child. She stated: "The wound cut across a large surface of skin and soft tissue at the front of the neck and the stab wound went into the body to a depth of about two and three-quarter inches going between two vertebrae or backbones in the neck region and cut the spinal cord in half which is a fatal wound." Dr. Field concluded that this injury was caused by a knife. Dr. Field testified that "[s]evering the spinal cord can produce a relatively fast death although this is lower on the cord than one that would be immediately fatal. But the severance of the cord at that level plus the bleeding from the wound would result in a death in a matter of a few minutes."

Dr. William Massello, an assistant chief pathologist for Western Virginia, performed an autopsy on the body of Jessica Shifflett. Jessica suffered a pattern of injuries to her neck area which were caused before her death. She had five stab wounds to her neck. Dr. Massello stated: "[T]wo stab wounds actually went into the muscles and very deeply into the neck going right across the neck from right to left and they injured a major artery, a major vein on the left side and a major vein on the right side. And the result was bleeding, very substantial external bleeding from these wounds and subsequent rapid death. [One] wound . . . did not go in as

11

deeply.  This [wound] went more directly into the neck only to a depth of about a half an inch and did not strike any vital structures and was not lethal per se . . . [T]he thyroid gland which is a gland that regulates your metabolism was injured and there was bleeding from there but was not to any degree as injurious or as rapidly lethal as the two wounds to the left side of the neck which cut the major arteries and veins in there."  Jessica also suffered bruises to her skull and had defensive wounds on her fingers and hands.

Ronald J. Jackson, an inmate who was incarcerated with Zirkle after he had been arrested for the murders of Jessica and Christina, gave the following testimony.  "An officer . . . let Mr. Zirkle know that he was going to be a patron of the car wash that was going to provide monies for the headstones of the two victims.  Mr. Zirkle, when the officer had acknowledged that he was going to be a patron, Mr. Zirkle said, 'Is Barbara going to be there?  Tell that bitch I said checkmate,' and [he] ran his finger across his throat, or his thumb across his throat."  Zirkle also told Jackson in a later conversation:  "Well, I wish I could have killed Ms. Shifflett . . . It would have been all worth it."

In 1988, Zirkle was convicted of armed robbery.  Nancy Berry, the victim of the robbery, testified that Zirkle entered a store where she was employed as a cashier.  He

displayed a butcher knife, Berry gave him money from a cash register, and Zirkle left the store.  In 1999, Zirkle pled guilty to possession of marijuana and was convicted of that offense.  The Commonwealth presented evidence that Zirkle had also threatened and abused members of Barbara Shifflett's family.

### III.  Passion, Prejudice, and Proportionality

#### A.

Counsel for Zirkle state that "every death case contains an element of passion," but they "cannot point to any evidence in the record that would indicate that the [c]ourt was influenced by passion, prejudice or any other arbitrary factor.  Counsel . . . ask[] the [c]ourt to review the proceedings contained in the Appendix and especially the presentence report in considering this issue."

We have reviewed the record, and we find no evidence that Zirkle's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.  We also observe that the circuit court repeatedly informed Zirkle that he was entitled to present evidence in mitigation, but Zirkle refused to permit his attorneys to present such evidence.

#### B.

The test of proportionality that we apply is whether "juries in this jurisdiction generally approve the supreme

penalty for comparable or similar crimes." Smith v. Commonwealth, 239 Va. 243, 271, 389 S.E.2d 871, 886 (quoting Stamper v. Commonwealth, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980)), cert. denied, 498 U.S. 881 (1990).

Zirkle's counsel state that since they were prevented "from presenting any evidence in mitigation, [they] cannot point to any evidence in the record that would indicate that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Counsel for Mr. Zirkle ask[] the Court to carefully consider the previous cases reviewed by this Court in determining whether the sentence imposed is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

We have examined the records in all capital murder cases reviewed by this Court since the adoption of Code § 17.1-313 and its predecessor, Code § 17-110.1. Applying the test of proportionality, we hold that the sentence of death imposed upon Zirkle is neither excessive nor disproportionate to the penalties imposed in similar cases, considering both the crime and the defendant. See Zirkle v. Commonwealth, 262 Va. 320, 551 S.E.2d 601 (2001); Walker v. Commonwealth, 258 Va. 54, 515 S.E.2d 565 (1999), cert. denied, 528 U.S. 1125 (2000);

14

Bramblett v. Commonwealth, 257 Va. 263, 513 S.E.2d 400, cert. denied, 528 U.S. 952 (1999); Beck v. Commonwealth, 253 Va. 373, 484 S.E.2d 898, cert. denied, 522 U.S. 1018 (1997); Clagett v. Commonwealth, 252 Va. 79, 472 S.E.2d 263 (1996), cert. denied, 519 U.S. 1122 (1997); Goins v. Commonwealth, 251 Va. 442, 470 S.E.2d 114, cert. denied, 519 U.S. 887 (1996); Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2d 394, cert. denied, 510 U.S. 848 (1993); George v. Commonwealth, 242 Va. 264, 411 S.E.2d 12 (1991), cert. denied, 503 U.S. 973 (1992).

IV.

Having reviewed the sentence of death pursuant to Code § 17.1-313, we decline to commute the sentence to imprisonment for life.  Accordingly, we will affirm the judgment of the circuit court.

Affirmed.