Present:  All the Justices

JAMES EARL PATTERSON

v.  Record No. 001798    OPINION BY JUSTICE ELIZABETH B. LACY
                                          September 14, 2001
COMMONWEALTH OF VIRGINIA

             FROM THE CIRCUIT COURT OF PRINCE GEORGE COUNTY
                       James F. D'Alton, Jr., Judge

     James Earl Patterson received a death sentence upon a

plea of guilty to a charge of capital murder in the commission

of a rape, Code § 18.2-31(5), in the death of Joyce Sneed

Aldridge.[1]  Although Patterson has waived his right of appeal,

Code § 17.1-313 mandates that we review the imposition of the

death sentence.  We must consider and determine whether the

sentence of death was imposed "under the influence of passion,

prejudice or any other arbitrary factor," and whether the

sentence is "excessive or disproportionate to the penalty

imposed in similar cases, considering both the crime and the

defendant."  Code § 17.1-313(C)(1) and (C)(2).

                            BACKGROUND

     On October 11, 1987, the Prince George County Police

Department received a telephone call at approximately 11:35

_____

     [1] Patterson also pled guilty to charges of abduction with
intent to defile, Code § 18.2-48, and rape, Code § 18.2-61,
and entered an "Alford plea," North Carolina v. Alford, 400
U.S. 25 (1970), to a charge of forcible sodomy, Code § 18.2-
67.1.  He was sentenced to consecutive terms of life
imprisonment for the abduction and sodomy convictions.
Patterson has not appealed those convictions.

p.m. from a person identifying herself as Joyce Aldridge. Ms. Aldridge stated that she had been raped and stabbed. When the police arrived at Ms. Aldridge's home, they found the front door ajar and a screen "knocked out" of the bathroom window at the rear of the house. The officers announced themselves and, when there was no reply, they entered the house. They found Ms. Aldridge's partially clothed body on the floor of the bathroom. Her dress had been ripped from the neck, and cloth ligatures, cut from bedding in the room, remained tied to her right wrist. She had been stabbed multiple times and could not be resuscitated by the emergency medical crew.

The police discovered signs of a struggle in the kitchen of the home with a chair knocked over, a drawer containing knives left open, and Ms. Aldridge's eyeglasses on the floor. The door to Ms. Aldridge's bedroom had been kicked open and footprints were found on the door. Footprints of the same type were found in the blood on the floor of the bedroom. The contents of Ms. Aldridge's purse had been dumped on the floor, dresser drawers were open and ransacked, and the nightstand had been knocked over. There was a large amount of blood on the bed and pillows and "[c]ast-off" blood spatters were on the wall next to the bathroom. The telephone cord had been pulled from the wall and the doorknob to the bathroom door had been pulled off the door. Ms. Aldridge's blood was found on

2

the telephone, the bathroom doorknob, and the latch on the window screen found in the backyard. These conditions indicated that she had attempted to flee her attacker by escaping through the window in the bathroom.

The medical examiner found seventeen stab wounds. Eight of the wounds were to Ms. Aldridge's neck, four to her upper back, one in her chest and several clustered in her abdominal area. The wounds ranged in depth from two to six inches. Two stab wounds to her aorta were fatal. The medical examiner also found a number of defensive wounds.

Seminal fluid was recovered from the victim's rectum and vagina and a semen stain was found on the bed. This evidence was preserved for testing. However, the perpetrator of the crime was not identified until over ten years later, when in 1998, the evidence was resubmitted to the Virginia DNA Laboratory. The subsequent testing yielded a "cold hit" – a match with a DNA profile maintained by the Virginia DNA Data Bank. The tested DNA matched that of James Earl Patterson who was serving a twenty-five year sentence at the Greensville Correctional Center for a rape unrelated to the rape of Ms. Aldridge.

The police obtained a search warrant for a fresh sample of Patterson's blood and additional testing confirmed that the DNA material found at Ms. Aldridge's house and that of the

defendant were consistent. The probability of finding someone else with the same DNA profile was less than 1 in 5.5 billion. When confronted with this information by the police, Patterson denied knowing Ms. Aldridge or ever being in her house.

In March 2000, Patterson agreed to discuss the crime with one of the police officers who had been involved in the Aldridge investigation if an agreement could be reached regarding his ability to see his family at the prison. After the family visit was arranged, Patterson confessed to raping and murdering Ms. Aldridge. Patterson said he knew Ms. Aldridge and went to her home on October 11, 1987 to steal money for drugs. He had planned to enter through a basement window but the window was locked. While he was looking for a utility knife he had dropped in the yard, Ms. Aldridge let her dog out in the yard. Patterson went to the door and asked Ms. Aldridge if he could borrow a flashlight on the pretext of needing it to search for lost car keys. When Ms. Aldridge opened the door, he forced his way into the house, kicked the door shut and demanded her pocketbook. He pushed her to the bedroom to get the purse. When the purse contained only coins, Patterson became "even more violent." After tying her hands behind her back with strips cut from the bed linen, he raped her.

4

Patterson went to the kitchen looking for a knife because he "wasn't going to leave any witnesses behind." He found a knife and stabbed Ms. Aldridge three times in the abdomen.

Patterson went back outside to find the lost utility knife, but reentered the house to make sure "she's gone." He kicked in the bedroom door which was shut and saw a telephone cord leading to the bathroom. He forced the bathroom door open and Ms. Aldridge came out. Patterson "hit[] her with the knife 4 or 5 times." After she "went down the wall," he left by way of the front door.

Prior to the entry of the guilty pleas, Patterson was examined by two psychologists, both of whom determined that Patterson was competent to tender a guilty plea and to make his own decisions in the case. Against the advice of counsel, Patterson entered the guilty plea. The trial court found Patterson guilty of capital murder and ordered a pre-sentence report.

At the sentencing hearing, the Commonwealth asserted that the killing of Ms. Aldridge was vile in that it involved torture, depravity of mind, and aggravated battery. In support of this contention, the Commonwealth relied on the testimony given at the guilt phase, that the victim did not die instantaneously, that the knife attack was carried out in a "savage[,] methodical manner," and that many more stab

5

wounds were inflicted than necessary to accomplish the murder of the victim.  Chabrol v. Commonwealth, 245 Va. 327, 335, 427 S.E.2d 374, 378 (1993); Hoke v. Commonwealth, 237 Va. 303, 316, 377 S.E.2d 595, 603, cert. denied, 491 U.S. 910 (1989).

The Commonwealth also asserted that Patterson would be a future danger to society.  In support of this position, the Commonwealth presented evidence of felony convictions for rape and grand larceny based on a 1988 incident in which Patterson asked two women for a ride home from a party.  When the driver exited the car, Patterson shoved her to the ground, got back in the car, and broke the handle of the passenger door to trap the other woman in the car.  Patterson "punched" the passenger in the face, drove the car to another location, and then raped her.  According to the Commonwealth, these crimes, committed after the rape and murder of Ms. Aldridge, along with the defendant's extensive juvenile record and fourteen instances of institutional offenses, including fighting, assault, and possession of drugs and intoxicants, support the conclusion that Patterson is a continuing danger to society.

Patterson refused to present evidence in mitigation of his sentence and instructed his attorney not to do so.  In exercising his right of elocution, Patterson expressed his sorrow and remorse for his actions and requested a sentence of death, stating that if he received a life sentence he could

not promise that "sometime that I may not spark out and ruin more lives." In imposing the death sentence, the trial court found that the aggravating factors of vileness in the commission of the crime and of future dangerousness to society were both supported by the evidence.

Pursuant to Code § 17.1-313(C), we must consider "any errors in the trial enumerated by appeal" in any case where a sentence of death is imposed. Accordingly, the trial court is required to forward the trial record of such a case to this Court where an appeal of right will be heard. Code § 17.1-313(B). On October 16, 2000, Patterson through counsel filed a Motion Not to Pursue Appeal with this Court. By order dated November 15, 2000, this Court ordered the matter returned to the trial court for a determination whether Patterson's decision not to appeal was made voluntarily and intelligently.

At a competency hearing held on January 4, 2001 in accordance with this Court's order, Patterson signed a waiver under oath, stating he did not want his case reviewed for "any alleged errors of the trial" and waived his right "to file an opening brief and to have my attorney present any oral arguments or to otherwise in any manner pursue appellate review." The trial court entered an order finding that Patterson knowingly, voluntarily, and intelligently waived his right to appeal.

7

DISCUSSION

While a defendant may waive his rights of appellate review and instruct his attorneys to refrain from seeking a commutation of his death sentence, a defendant may not waive the review process mandated by Code § 17.1-313(C). "[T]he purpose of the review process is to assure the fair and proper application of the death penalty statutes in this Commonwealth and to instill public confidence in the administration of justice." Akers v. Commonwealth, 260 Va. 358, 364, 535 S.E.2d 674, 677 (2000). Accordingly, pursuant to our order of November 15, 2000, Patterson's counsel has filed a brief limited to the issues we must consider pursuant to Code § 17.1-313(C) and participates in this process as an officer of the Court. Id.

We first consider whether the death sentence in this case "was imposed under the influence of passion, prejudice or any other arbitrary factor." Code § 17.1-313(C)(1). This crime was brutally executed. The victim was bound, raped, and then repeatedly stabbed so that there would be no witness to the crime. The evidence shows that the victim apparently attempted to survive her attack by hiding in the bathroom, placing a call to the police, and then, when her attacker returned, trying to escape out a rear window in the bathroom. We find no indication in the record that, in imposing the

8

death sentence for these acts, the trial court's sentencing decision was influenced by passion, prejudice, or any arbitrary factor, but rather we find that it was based entirely upon a reasonable evaluation of the evidence.

We next focus our evaluation on whether the sentence of death in this case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17.1-313(C)(2). We have accumulated the records of all capital murder cases reviewed by this Court. Code § 17.1-313(E). The records include not only those capital murder cases in which the death penalty was imposed, but also those in which the trial court or jury imposed a life sentence and the defendant petitioned this Court for an appeal.

In making this proportionality review, we have focused specifically on cases in which the facts are similar to those of this case – where the predicate offense is rape and the death sentence was imposed upon a finding that both aggravating factors, vileness and future dangerousness, were present. We conclude that, in considering both the crime and the defendant, Patterson's sentence is neither excessive nor disproportionate to the penalties imposed by other sentencing bodies in the Commonwealth for comparable acts. See, e.g., Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293

9

(1999) (forced entry into victim's home; robbery, rape, and murder of excessive beating with a hammer); Beck v. Commonwealth, 253 Va. 373, 484 S.E.2d 898 (1997) (beat, raped, and murdered victim in her home; sentence imposed upon a plea of guilty); Williams v. Commonwealth, 248 Va. 528, 450 S.E.2d 365 (1994) (forced entry into victim's home and committed robbery, rape, murder, and arson); Hoke, 237 Va. 303, 377 S.E.2d 595 (1989) (victim bound, stabbed, raped, and murdered in home); Mason v. Commonwealth, 219 Va. 1091, 254 S.E.2d 116 (1979) (beat, tortured, raped, and murdered victim in her home; sentence imposed upon a guilty plea).

Having found no error below and perceiving no other reason to commute or set aside the sentence of death, we will affirm the judgment of the trial court.

Affirmed.