PRESENT:  Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Agee, JJ., and Russell, S.J.

RICKY JAVON GRAY, A/K/A                        OPINION BY
RICKY JOVAN GRAY                         JUSTICE G. STEVEN AGEE
                                             June 8, 2007
v. Record No. 062659

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Beverly W. Snukals, Judge

In this appeal, we consider the capital murder convictions and death sentences imposed upon Ricky Javon Gray[1] in the Circuit Court of the City of Richmond.  A grand jury indicted Gray on five counts of capital murder arising from the murders of Bryan Harvey, Kathryn Harvey, Stella Harvey and Ruby Harvey, in violation of Code §§ 18.2-31(4), (7), (8), and (12).

In the first stage of a bifurcated trial conducted under Code § 19.2-264.3, a jury convicted Gray of the following offenses: capital murder of Bryan Harvey in the commission of robbery or attempted robbery under Code § 18.2-31(4); capital murder of Bryan Harvey, Kathryn Harvey, Stella Harvey and Ruby Harvey as part of the same transaction under Code § 18.2-31(7); capital murder of Bryan Harvey, Kathryn Harvey, Stella Harvey and Ruby Harvey within a three-year period under Code § 18.2-31(8); capital murder of four year old Ruby Harvey while Gray

_____

    [1] The record contains different spellings of Ricky Gray's middle name.  We will spell his name "Javon," consistent with the indictments.

was twenty-one years of age or older under Code § 18.2-31(12); and capital murder of nine year old Stella Harvey while Gray was twenty-one years of age or older under Code § 18.2-31(12).

In the separate penalty phase of the trial, the jury found the aggravating factor of vileness and fixed Gray's sentence at death for each of the two convictions under Code § 18.2-31(12) and life imprisonment for the remaining capital murder convictions. After reviewing the post-sentence report required by Code § 19.2-264.5, the circuit court sentenced Gray in accordance with the jury's verdicts and entered final judgment. We review the circuit court's judgment and death sentences pursuant to Code § 17.1-313(A).

After consideration of Gray's assignments of error, the record, and the arguments of counsel, we find no error in the judgment of the circuit court and will affirm that judgment, including the sentences of death.[2]

I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party in the

---

[2] Gray does not appeal the judgment of the circuit court as to the capital murder convictions under Code § 18.2-31(4), (7) and (8).

2

circuit court.[3]  Juniper v. Commonwealth, 271 Va. 362, 376, 626

S.E.2d 383, 393, cert. denied, 549 U.S. ___, 127 S.Ct. 397

(2006); see also Burns v. Commonwealth, 261 Va. 307, 313, 541

S.E.2d 872, 877, cert. denied, 534 U.S. 1043 (2001); Lovitt v.

Commonwealth, 260 Va. 497, 502, 537 S.E.2d 866, 870 (2000),

cert. denied, 534 U.S. 815 (2001).

## A. GUILT PHASE

On the morning of January 1, 2006, Kathryn and Bryan Harvey

and their two daughters, Stella and Ruby, were killed in the

Harveys' home in the City of Richmond.  Firefighters, responding

to a call that the Harveys' home was burning, discovered the

bodies of Kathryn and Ruby in the basement as they attempted to

fight the fire.  The house was filled with "black smoke" and the

basement was burning and had "[z]ero visibility and a lot of

heat."  Soon after the firefighters removed the bodies of

Kathryn and Ruby from the basement, they determined that the

bodies showed evidence of "battle signs" and that the victims'

legs had been bound.  At that point the firefighters stopped

their rescue efforts and summoned the police.

Detective Dwyer of the Richmond Police Department then

discovered Stella in the basement under a futon "with her hands

behind her back, tape around her mouth."  Bryan was discovered

---

[3] Gray did not present any evidence during the guilt phase
of the trial.

3

on the floor of the basement with orange electrical cord wrapped around his wrists and feet, with "melted tape around his face [and a] large wound to his neck area." Detective Dwyer also found two claw hammers, two broken wine bottles, a knife handle and a separate knife blade in the basement. Those items, as well as several photographs of the scene, were admitted into evidence at trial.

An autopsy revealed that Bryan had been cut eight times in his neck and underneath his chin, and those wounds, although "[v]ery painful," were not immediately fatal. His mouth had been gagged and taped. Six lacerations were made to the left side and back of Bryan's skull, each caused by blows from a hammer. He experienced severe third degree burns to his skin. Bryan died from the wounds to his skull.

Kathryn had been cut three times in her neck and chest, once in her back, and those wounds caused bleeding and pain but were not fatal. Multiple lacerations were made to Kathryn's skull as a result of blows from a hammer. The hammer blows caused a fracture to the plate above Kathryn's eyes, resulting in bleeding behind her eyes. Kathryn died from the blunt force injuries to her head.

Ruby's throat had been sliced through to her trachea, a wound that was not fatal but obstructed her breathing. Her head was also fractured and cut, causing brain tissue to exude from

4

her skull.  She had also been stabbed in the back with enough force that the knife had passed through her ribs and into her lungs.  Ruby died from the blunt force injuries to her head and the stab injury to her lungs.

Stella's neck had been cut six times, with the stab wounds having penetrated her trachea and esophagus.  Stella's head was also bludgeoned by a hammer, causing brain tissue to exude from her skull.  She died from a combination of smoke inhalation, carbon monoxide poisoning and blunt force injury to her head.

Forensic evidence showed that the knife blade recovered from the Harveys' home had traces of blood from Kathryn, Stella, Ruby and Bryan.  Bryan and Stella's DNA was discovered on the shaft of one of the recovered hammers.  Kathryn's DNA was identified on the handle of the other hammer.

Evidence at trial established that Gray, Ray Dandridge and Ashley Baskerville were driving the streets of Richmond in Gray's van during the mid-morning of January 1, 2006 "looking for a house to rob."  Gray and Dandridge "spotted a door open" at the Harveys' home, entered the house, and forced Kathryn, Bryan and Ruby into the basement.[4]  Stella was not home when Gray and Dandridge entered.  In the basement, Gray assured the three family members that he and Dandridge would leave after they took

_____

[4] Gray claimed that Baskerville was asleep in the vehicle and did not participate in the crimes at the Harveys' home.

5

what they wanted from the home.  Gray then used electrical cords to tie Bryan's wrists behind his back and bind his ankles together.

Before Gray and Dandridge could plunder the house, they heard a noise upstairs on the home's main level.  Kiersten Perkinson, a family friend, had arrived at the Harveys' home to deliver the Harveys' daughter, Stella, along with Perkinson's own daughter, Grace Lynn, from a slumber party the previous evening.

Hearing the commotion, Kathryn explained to Gray that her daughter had returned from a slumber party, so Gray permitted Kathryn to go upstairs to bring her daughter downstairs to the basement.  Perkinson heard Kathryn "running up the stairs" from the basement, and upon reaching the top of the basement stairs, she appeared "pale and ashen."  Stella ran past her mother and down the stairs into the basement, but Kathryn blocked Grace Lynn's path so she could not follow Stella downstairs.  Kathryn told Perkinson that she did not feel well, so Perkinson and Grace Lynn left the house.

Downstairs, Gray bound the hands and feet of all the Harveys and placed clear packing tape over their mouths, but he assured them that everything would be okay.  Gray and Dandridge then began collecting the items from the home they intended to steal.  Kathryn attempted to comfort her distraught daughters,

6

and she told Gray that he should take what he wanted and just leave.  Suddenly, Gray took a razor knife and cut Kathryn's throat and then cut the throats of the young girls and Bryan.[5]  When Gray saw that his victims were still moving, he took a nearby claw hammer and began repeatedly beating each of the Harveys in the head.  When they stopped moving, Gray poured two bottles of wine on an easel in the basement and lit a match, starting the fire.  Gray and Dandridge then left the burning home with the items they had stolen.

John Hott, a family friend of the Harveys, arrived at the Harveys' home for a New Year's Day party at about 1:45 p.m. and noticed smoke coming from the house.  He immediately ran to a neighbor's home and called "911".

Less than a week later, Richmond police received a tip that Gray was a suspect in the murders, and a member of the Richmond Police Department contacted the Philadelphia, Pennsylvania Police Department requesting they investigate a location where Gray may be staying and to be on the lookout for a particular vehicle believed related to the Harvey murders.  In the early morning hours of January 7, 2006, Philadelphia police obtained a search warrant, and a SWAT team entered the location where Gray

---

[5] In his confession to police, Gray indicated that Dandridge "did the old man, cut him.  But I'm not sure.  But it doesn't matter if he did or not cause he was still alive after, [un]til I hit him with [t]he hammer."

7

was suspected to be staying and found him in the basement. Gray was arrested and advised of his <u>Miranda</u> rights. After learning that Dandridge was also being questioned, he asked the Philadelphia police: "Can I tell you my side of the story?"

As part of a signed confession, Gray described in detail how he and Dandridge entered the Harveys' home and attacked the Harveys, in which he stated:

> [I]t was a real nasty scene. How am I suppose[d] to explain something like what happened? I started cutting their throats and they kept getting up and they [were] scaring me. I remember seeing the hammer and picking it up, and then . . . I was just hitting them all with the hammer. All I know is nobody was moving when I left out there.

Gray admitted that Dandridge spent most of this time searching the home for items to steal, and that only Gray used the hammers to attack the Harveys.

Gray stipulated at trial that Bryan's wedding ring, as well as a cookie plate and a basket from the Harveys' home, were discovered in a location Gray provided to police, who also recovered from Gray a computer stolen from the Harveys' home. Gray also stipulated that the boots found at the residence in Philadelphia belonged to him. Bryan and Stella's blood stains were discovered on Gray's boots. The Commonwealth also introduced photographs of the dead bodies as exhibits during the trial, and the jury was permitted to view these exhibits. At the time of the murders, Gray was twenty-eight years old. Ruby

was four years old at the time of her death, and Stella was nine years old at the time of her death.

The jurors returned a verdict of guilty as to all five capital murder counts as charged in the indictments.

## B. PENALTY PHASE

In the sentencing phase, the Commonwealth introduced evidence of Gray's criminal record, including convictions for robbery in 1996, distribution of crack cocaine in 2000, and possession of cocaine in 2002. Extensive evidence was also presented to show a history of violent acts perpetrated by Gray.

Lieutenant Daniel Stanek of the City of Washington, Pennsylvania, Police Department testified about the discovery of the dead body of Gray's wife, Treva, on November 5, 2005. Gray was questioned at the time but was not arrested for her murder. After his arrest for the murders of the Harveys in January 2006, Gray also confessed to killing his wife with the help of Dandridge by bludgeoning her to death with a lead pipe.

Detective William Brerton of the Richmond Police Department described how, also on January 1, 2006, he learned of another set of murders committed in Richmond. Executing a search warrant, police discovered the dead bodies of Percyell Tucker, his wife, Mary, and Mary's daughter, Ashley Baskerville[6], all in

---

[6] Ashley Baskerville was the third person with Gray and Dandridge on January 1 when the Harveys were murdered. During

9

their home.  Dr. Darin Trelka, a medical examiner, testified that the autopsy revealed Percyell's head had been "covered with Saran Wrap," with a sock stuffed into his mouth and duct-taped shut.  Percyell probably struggled for several minutes before he died from suffocation.  Mary's mouth had been gagged, with duct tape over her eyes.  Her neck and chest had been cut four times.  Mary struggled several minutes before she died from suffocation.  Ashley was found with a plastic shopping bag over her head and taped to her neck with duct tape.  Her face was wrapped in duct tape and a sock stuffed into her mouth.  Ashley also struggled for several minutes before she died from suffocation.

Gray's vehicle was discovered three blocks from the Tucker's home, and the Tucker's stolen vehicle was located in Philadelphia where Gray was arrested.  Gray confessed to murdering the Tucker family.

Police also learned that Gray assaulted a man in Arlington, Virginia on New Year's Eve, 2005.  At the sentencing phase of Gray's trial, Ryan Carey testified that as he arrived at his parent's home after work on December 31, he was attacked by two men.  He was forced to the ground and stabbed multiple times.  Carey escaped the assault and rushed to his father's home

Gray's confession to the murder of the Tuckers, Gray explained how Ashley was working with Gray and Dandridge and provided them a key to enter the Tucker residence.  "She was taped up as part of the plan."

covered in blood. Carey's father contacted emergency personnel, who took Carey to a hospital where his condition was stabilized. After two months of hospitalization, Carey was able to return home, although he lost the use of his right arm. Gray confessed to assaulting Carey with Dandridge's assistance and stipulated that Carey's blood was found on Gray's boots.

Also testifying at the penalty phase of the trial were Mark Harvey, Bryan's older brother, and Steven Culp, Kathryn's older brother. Each described a loving relationship with their sibling and the devastating grief and emotional impact of the murders upon the extended families.

Gray offered evidence in mitigation including his mother's testimony describing his childhood and home life. Gray's mother, Barbara Moten, described how she established a connection between Gray and his natural father, Ellsworth, when Gray was a baby.[7] Moten later married Ellsworth and moved with him to Maryland, along with their two children and two of Ellsworth's children from another relationship. In school, Gray struggled to learn to read, was hyper and disruptive in the classroom, and he received spankings with a "horse strap" from Ellsworth when the school reported Gray was disruptive in class.

---

[7] Moten was not married to Ellsworth or living with him when Gray was born.

Moten also told of how Gray "wet himself" most nights until he was thirteen years old, resulting in beatings from Ellsworth.

Moten also described instances of sexual abuse of two of the children by a friend of Ellsworth, although she maintained that Gray was not a victim of these encounters. Gray was routinely blamed by his siblings for things that happened in the house, resulting in beatings from Ellsworth. Moten told of how she joined the Army and worked in Arlington, Virginia as a chaplain's assistant.

The Army transferred Moten for a year to the State of Washington, but Gray remained in Maryland with his father and stepbrother. During that time, Ellsworth became a cocaine addict. Upon her return from Washington, Moten also learned that Ellsworth's son, Fitzgerald, had been sexually abusing Gray, although Gray had refused to talk about the abuse with his mother. Later, Ellsworth was arrested and jailed on drug charges. Moten then moved the family to Pennsylvania for a new start. Gray left the home when he was seventeen years old.

Gray's sister, Ava, also testified about repeated instances of sexual abuse upon her and Gray by Fitzgerald. She also described Gray being victimized by Fitzgerald when he was only four years old, and that such experiences were "a regular thing" over the course of seven years. She also testified that Gray

12

started to use drugs when he was thirteen years old and was a user of marijuana, cocaine and PCP.

Also presented as mitigation evidence was the videotaped deposition of Dr. David Lisak, a psychologist and expert on the impact of child abuse and the relationship between earlier trauma and the perpetration of violence. Dr. Lisak offered his opinion on the general effects of early childhood abuse.

Gray also presented the opinion of Dr. Mark D. Cunningham, a clinical and forensic psychologist, who opined that Gray was "likely to make a positive adjustment to prison or an adjustment that is free of serious violence." Dr. Cunningham's conclusions were based, in part, on the fact that Gray was nearly thirty years old and that "his likelihood of getting in trouble in prison is only about half as much as when he was 18 or 20 years old, and continues to fall steadily across the life span." Dr. Cunningham noted Gray's history of incarceration and how Gray had avoided violent encounters in prison, how Gray had used his prison time to earn a GED, and how Gray had earned additional education, including courses on sheet metal, business and electrical work. Dr. Cunningham also concluded that "the seriousness of the offense does not predict violence in prison" and that "[c]apital inmates who get sentenced to life or in the general prison population have low rates of violence."

In response to Gray's mitigation evidence, the Commonwealth produced the testimony of Officer James Jonas of the Philadelphia Police Department, who testified about the search and arrest of Gray on January 7, 2006. Officer Jonas explained that during the execution of the warrant to arrest Gray, he discovered Gray hiding in an unlit basement, crouched behind a water heater. Officer Jonas described how Gray had smirked at him when asked to show his hands, and that Gray had refused to show one of his hands, which Officer Jones identified as a potentially threatening gesture. Officer Jonas explained how in the attempt to secure Gray, Gray punched him and resisted arrest. Gray also assaulted Officer Jonas' partner and attempted to grab the officer's gun. After multiple punches were exchanged, the officers were eventually able to secure and handcuff Gray.

## II. ANALYSIS

Gray presents four assignments of error on appeal. First, he avers that the sentences of death were imposed under the influence of passion, prejudice and other arbitrary factors. His second assignment of error contends that the sentences of death are excessive or disproportionate to the penalty imposed in similar cases. Next, Gray asserts that the circuit court erred by failing to declare Code § 18.2-31(12) unconstitutional as violating his right to equal protection under the law.

14

Finally, Gray contends that the Virginia death penalty statutes otherwise violate the Virginia and United States Constitutions.

Gray's first two assignments of error "track nearly *verbatim* the mandatory review of a sentence of death which this Court must undertake under Code § 17.1-313(C)(1) and (2)." Juniper, 271 Va. at 431, 626 S.E.2d at 426. We thus consider his first two assignments of error simultaneously with our statutory review and then address the remaining assignments of error.

### A. Statutory Review Under Code § 17.1-313

Pursuant to Code § 17.1-313(A) and (C), we perform a statutorily mandated review of the death sentences. "[T]he purpose of the review process is to assure the fair and proper application of the death penalty statutes in this Commonwealth and to instill public confidence in the administration of justice." Hudson v. Commonwealth, 267 Va. 29, 33, 590 S.E.2d 362, 364 (2004) (quoting Akers v. Commonwealth, 260 Va. 358, 364, 535 S.E.2d 674, 677 (2000)).

We thus review Gray's death sentences to determine whether the circuit court imposed the sentences "under the influence of passion, prejudice or any other arbitrary factor" and whether the sentences are "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the

15

defendant." Code § 17.1-313(C)(1)-(2). See e.g., Hudson, 267 Va. at 33, 590 S.E.2d at 364.

### 1. Code § 17.1-313(C)(1) Passion, Prejudice or Other Arbitrary Factor

Gray assigns error to the jury's imposition of the death penalty because the sentences were "imposed under the influence of passion, prejudice or other arbitrary factors." While Gray presents no argument on appeal regarding this assignment of error and cites to nothing in the record to support his claim, this Court must still conduct the statutorily prescribed review under Code § 17.1-313(C)(1) to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." See Juniper, 271 Va. at 431-32, 626 S.E.2d at 427; Muhammad v. Commonwealth, 269 Va. 451, 532, 619 S.E.2d 16, 63 (2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2035 (2006); Williams v. Commonwealth, 252 Va. 3, 5, 472 S.E.2d 50, 51, cert. denied, 519 U.S. 998 (1996). After careful review of the record, we find no evidence indicating that the jury or the circuit court were influenced by passion, prejudice or any other arbitrary factor in sentencing Gray to death.

### 2. Code § 17.1-313(C)(2) Excessive or Disproportionate Sentence

Gray also assigns error to the jury's imposition of death because the sentences are "excessive or disproportionate to the penalty imposed in similar cases." Again, Gray presented no

16

argument on appeal regarding this assignment of error. However, this does not affect the Court's statutorily prescribed review under Code § 17.1-313(C)(2) to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." See Juniper, 271 Va. at 432, 626 S.E.2d at 427.

The goal of the proportionality review of a death sentence is not to ensure "complete symmetry" for all death penalty cases but rather to find the "aberrant death sentence." Muhammad, 269 Va. at 532, 619 S.E.2d at 63 (citing Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000)). This review is designed to determine whether "other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Lovitt v. Commonwealth, 260 Va. 497, 518, 537 S.E.2d 866, 880 (2000).

We have taken into account the circumstances of the crimes and Gray as the defendant. Pursuant to Code § 17.1-313(E), we have compared the record in this case with other capital murder cases, including those cases when a life sentence was imposed. Our review included those cases when a person under the age of fourteen was murdered by someone age twenty-one or older and the aggravating factor of vileness was found. See Zirkle v. Commonwealth, 262 Va. 320, 321-22, 551 S.E.2d 601, 601-02 (2001)

17

(finding by trial court of both vileness and future dangerousness). Even though no cases were found that were exactly similar to Gray's case, "the lack of directly comparable [cases] does not prevent our consideration of whether the sentence imposed in this case was disproportionate." Walker v. Commonwealth, 258 Va. 54, 73, 515 S.E.2d 565, 576 (1999), cert. denied, 528 U.S. 1125 (2000). While Zirkle involved the finding of both aggravating factors, we have approved sentences of death in comparable cases involving only a finding of vileness. See Bailey v. Commonwealth, 259 Va. 723, 728, 734, 529 S.E.2d 570, 573, 576, cert. denied, 531 U.S. 995 (2000) (sentence of death under Code § 18.2-31(7) and (12) for murdering wife and 2-year-old son). We have also upheld sentences of death in cases when the victims were as young or younger than Stella and Ruby Harvey and the defendant was at least twenty-one years old. See Juniper, 271 Va. 362, 626 S.E.2d 383 (convicted under subsection (12) when the defendant was age 32 and victims ages 4 and 2); Zirkle v. Commonwealth, 262 Va. 320, 551 S.E.2d 501 (convicted under subsection (12) when the defendant was age 29 and the victim age 4); Bailey v. Commonwealth, 259 Va. 723, 529 S.E.2d 570 (convicted under subsection (12) when the defendant was age 28 and victim age 2); Bramblett v. Commonwealth, 257 Va. 263, 513 S.E.2d 400, cert. denied, 528 U.S. 952 (1999) (convicted under subsection (7) when the defendant was age 52 and victim

18

age 3); Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2d 394, cert. denied, 510 U.S. 848 (1993) (convicted under subsection (7) when the defendant was age 37 and victim age 5 months). Based on this review, we conclude that Gray's sentences of death were not excessive or disproportionate to the sentences of death imposed by other sentencing bodies in comparable cases with comparable defendants.

### B.   Code § 18.2-31(12) and the Equal Protection Clause

Code § 18.2-31(12) provides that capital murder includes "[t]he willful, deliberate and premeditated killing of a person under the age of fourteen by a person age twenty-one or older." Gray assigns error to the circuit court's ruling that this statute does not violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

Gray contends that Code § 18.2-31(12) exposes some murderers to the death penalty while protecting other similarly situated offenders from that penalty. This is so, Gray argues, because if a twenty year old defendant murdered the Harvey children, that person would not be eligible for a sentence of death under subsection (12). By contrast, Gray is eligible for the death penalty because he was twenty-one years of age or older when he killed the Harvey children. Gray argues that this disparate treatment under Code § 18.2-31(12) deprives him of a

19

fundamental right to life and liberty and that Code § 18.2-31(12) thus requires strict scrutiny review in an equal protection context. He concludes that the Commonwealth failed to assert a compelling state interest under strict scrutiny review to justify the varying treatment of defendants under Code § 18.2-31(12). In the alternative, Gray contends the statute does not meet rational basis scrutiny.

The Commonwealth initially responds that Gray waived his argument that strict scrutiny applies to his equal protection claim because the circuit court ruled only on a rational basis standard, and Gray did not ask the court to rule under any other standard. The Commonwealth also contends that a rational basis standard is the correct standard because the legislative classification in Code § 18.2-31(12) does not burden a suspect class or interfere with a fundamental right. The Commonwealth asserts that under a rational basis review, Code § 18.2-31(12) does not violate the Equal Protection Clause.

The Commonwealth's contention that Gray waived his right to argue a strict scrutiny standard on appeal is incorrect. Gray raised the argument that Code § 18.2-31(12) was unconstitutional under the Equal Protection Clause in a pre-trial motion to dismiss and "declare Code § 18.2-31(12) unconstitutional." In support of that motion, Gray filed a memorandum of law in the circuit court in which he argued "classifications that attach to

20

the implementation of the death penalty should also be subject to strict scrutiny" and that "the Commonwealth must have a compelling interest to justify its age-based classification."

The circuit court conducted a pre-trial hearing on the motion to dismiss, but Gray did not argue at the hearing that a strict scrutiny standard applied. The circuit court ruled at the hearing that Code § 18.2-31(12) "is not unconstitutional and there was a rational basis for delineating that distinction," thus implicitly rejecting Gray's strict scrutiny argument.[8] However, Gray's memorandum requesting strict scrutiny analysis was before the circuit court and was sufficient to preserve the argument for appeal. Code § 8.01-384(A); see also Luckett v. Jennings, 246 Va. 303, 306, 435 S.E.2d 400, 401 (1993). Thus Gray's strict scrutiny claim was not waived.

Because we conclude that Gray did not waive his strict scrutiny argument, we must therefore determine the appropriate standard, whether strict scrutiny or rational basis, to apply in our review of Code § 18.2-31(12) under an equal protection claim. A statute challenged on equal protection grounds is evaluated under "strict scrutiny" if it interferes with a "fundamental right" or discriminates against a "suspect class." Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 457-58

---

[8] The circuit court entered an order denying the motion to dismiss on May 19, 2006, which contained no further explanation of the court's ruling.

21

(1988); see also Hess v. Snyder Hunt Corp., 240 Va. 49, 55, 392

S.E.2d 817, 821 (1990). Otherwise, a statute will ordinarily

survive an equal protection challenge if "the challenged

classification is rationally related to a legitimate

governmental purpose." Kadrmas, 487 U.S. at 458 ("rational

basis" test); see also Hess, 240 Va. at 55, 392 S.E.2d at 821.

Code § 18.2-31(12) makes a distinction between murderers

twenty-one years old and older and those under the age of

twenty-one for application of the death penalty.[9] However, this

disparity among age groups alone does not trigger a more

stringent level of constitutional scrutiny, because age is not a

suspect classification under the Equal Protection Clause. Kimel

v. Florida Bd. of Regents, 528 U.S. 62, 83-84 (2000); see also

Gregory v. Ashcroft, 501 U.S. 452, 470-71 (1991); Massachusetts

Bd. of Retirement v. Murgia, 427 U.S. 307, 313-14 (1976).

Indeed, Gray concedes on appeal that he is not a member of a

suspect class for purposes of strict scrutiny analysis under

Code § 18.2-31(12).

We next consider whether Code § 18.2-31(12) burdens a

fundamental right, requiring strict scrutiny review, which Gray

---

[9] The minimum age for death penalty eligibility is eighteen years old. See Roper v. Simmons, 543 U.S. 551, 568, 572-75 (2005); Code § 18.2-10(a). This constitutionally-mandated minimum age requirement creates a distinction in Code § 18.2-31(12) between offenders age eighteen, nineteen and twenty years old, and those who are twenty-one and older.

22

posits as a "fundamental right to life and liberty." Gray does not cite, nor do we find, any criminal case with an equal protection analysis based on a "fundamental right to life and liberty." Gray also was unable to cite, nor do we find, any capital murder case from any court that applied strict scrutiny review to an equal protection claim made by a convicted capital murder defendant facing a death sentence.

This Court has uniformly upheld as constitutional the classification of offenses in Code § 18.2-31 under a rational basis standard. See Pope v. Commonwealth, 234 Va. 114, 121-22, 360 S.E.2d 352, 357 (1987), cert. denied, 485 U.S. 1015 (1988); Stockton v. Commonwealth, 227 Va. 124, 135, 314 S.E.2d 371, 378 (1984), cert. denied, 469 U.S. 873; Whitley v. Commonwealth, 223 Va. 66, 77-78, 286 S.E.2d 162, 169 (1982), cert. denied, 459 U.S. 882 (1983). Other courts have likewise applied a rational basis standard of review for equal protection claims raised by capital murder defendants. For example, the United States Court of Appeals for the Fifth Circuit, citing Gregg v. Georgia, 428 U.S. 153 (1976), has held that the "equal protection clause[] do[es] not require a higher level of scrutiny for legislative classifications that may result in the death penalty." Gray v. Lucas, 677 F.2d 1086, 1104 (5th Cir. 1982). See, e.g., Styron v. Johnson, 262 F.3d 438, 453 (5th Cir. 2001) (denying habeas relief to a defendant convicted of capital murder and examining

equal protection argument under rational basis review); State v. Higgins, 826 A.2d 1126, 1147 (Conn. 2003) (applying rational basis standard of review for equal protection argument by capital murder defendant); Henderson v. State, 962 S.W.2d 544, 561 (Tex. Crim. App. 1997) (applying rational basis standard to equal protection argument in capital murder case).  We find no precedential basis to apply a strict scrutiny standard as Gray contends and therefore apply a rational basis standard of review to Gray's challenge that Code § 18.2-31(12) is unconstitutional under equal protection grounds.[10]

A classification reviewed under a rational basis standard "is accorded a strong presumption of validity."  Heller v. Doe, 509 U.S. 312, 318-21 (1993); see FCC v. Beach Communications, Inc., 508 U.S. 307, 313-15 (1993); Kadrmas, 487 U.S. at 462; Hodel v. Indiana, 452 U.S. 314, 331-32 (1981); Murgia, 427 U.S. at 314.  Such a classification comports with the Equal Protection Clause if a rational relationship exists between the disparity of treatment and some legitimate governmental purpose. See, e.g., Nordlinger v. Hahn, 505 U.S. 1, 11 (1992).  Further,

---

[10] Gray cites to Skinner v. Oklahoma, 316 U.S. 535 (1942), as a basis for strict scrutiny analysis of an equal protection claim in a criminal case.  However, Skinner dealt with an individual's right to procreation, a recognized fundamental right in equal protection consideration.  Id. at 541.  Skinner does not stand for the principle advanced by Gray, that there is a fundamental right to life and liberty in all criminal cases to which a strict scrutiny equal protection analysis applies.

24

the legislature establishing such a distinction is not required to "actually articulate at any time the purpose or rationale supporting its classification." Nordlinger, 505 U.S. at 15; see also, e.g., United States Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 179 (1980); Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528 (1959). Indeed, the classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Beach Communications, 508 U.S. at 313. See also, e.g., Nordlinger, 505 U.S. at 11; Sullivan v. Stroop, 496 U.S. 478, 485 (1990). As the United States Supreme Court stated in Gregg,

> [I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. . . .
>
> The deference we owe to the decisions of the state legislatures under our federal system is enhanced where the specification of punishments is concerned, for "these are peculiarly questions of legislative policy."

428 U.S. at 175-76 (internal citations omitted) (quoting Gore v. United States, 357 U.S. 386, 393 (1958)).

Particularly because the rational basis standard applies to our examination of Code § 18.2-31(12), Payne v. Commonwealth, 233 Va. 460, 474, 357 S.E.2d 500, 509 (1987), we will accord

25

that legislative act a presumption of constitutionality.[11]  Under well-established rational basis analysis, the Commonwealth has no obligation to produce evidence to sustain the rationality of Code § 18.2-31(12) because "[a] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."  Finn v. Virginia Retirement Sys., 259 Va. 144, 155, 524 S.E.2d 125, 131 (2000) (quoting Heller, 509 U.S. at 320, and Beach Communications, 508 U.S. at 315).  "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."  Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973) (internal quotation marks omitted).

Applying the rational basis standard of review, we consider first whether a rational basis exists for the General Assembly's inclusion of subsection (12) within the statutory framework of capital offenses in Virginia under Code § 18.2-31.  While the legislature may make certain distinctions among which acts deserve harsher penalties, a criminal statute which affords a sentencing judge or jury an unbridled choice between the death penalty and a lesser sentence violates the Eighth and Fourteenth Amendments.  Furman v. Georgia, 408 U.S. 238 (1972); see also

---

[11] Under a strict scrutiny standard, the legislative act is accorded "no presumption of constitutionality."  Qutb v. Strauss, 11 F.3d 488, 492 (5th Cir. 1993).

Whitley v. Commonwealth, 223 Va. 66, 77, 286 S.E.2d 162, 168 (1982).  Subsection (12) is the only subsection in Code § 18.2-31 to create an age distinction as a predicate element for either the offender or the victim.  However, the other subsections, although not making age distinctions, create other specific predicate requirements differentiating capital murder from all other murders when the predicate is satisfied.

These predicates include, for example, premeditated killing of a person by another for hire in subsection (2), killing during the commission of robbery or attempted robbery in subsection (4), killing during the commission of rape or attempted rape in subsection (5), killing a law enforcement officer but only when the killing "is for the purpose of interfering with the performance of his official duties" in subsection (6), or killing during the commission or attempted commission of an act of terrorism in subsection (13).  Each subsection involves legislative decisions about which predicate acts or status separate any act of murder from those of capital murder.  Teleguz v. Commonwealth, 273 Va. 458, 643 S.E.2d 708 (2007) (subsection (2)); Jackson v. Commonwealth, 266 Va. 423, 587 S.E.2d 532 (2003) (subsection (4)); Patterson v. Commonwealth, 262 Va. 301, 551 S.E.2d 332 (2001) (subsection (5)); Bell v. Commonwealth, 264 Va. 172, 563 S.E.2d 695 (2002)

27

(subsection (6)); Muhammad v. Commonwealth, 269 Va. 451, 619 S.E.2d 16 (2005) (subsection (13)).

Inclusion of subsection (12) as a capital murder offense is similar to the other subsections of Code § 18.2-31 in that a specific and narrow category of murder, the murder of a child under fourteen by an adult over age twenty, is made a capital offense.  In that regard, the age predicates in subsection (12) are similar to the predicates in the other subsections of Code § 18.2-31.  This conclusion comports with our holding in Whitley, when we stated that "[w]e believe the grades of the offense and their respective penalties are rationally related, and, considering the sentencing standards and procedures the capital murder statutes mandate, we hold that sentencing discretion is 'suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' "  223 Va. at 78, 286 S.E.2d at 169 (quoting Gregg, 428 U.S. at 189). Thus, subsection (12) meets a rational basis for inclusion in Virginia's capital murder statute as it provides for only very specific and limited types of murder to qualify as capital murder.

We now consider whether a rational basis exists for the age distinctions made within subsection (12).  In doing so, we note Gray does not challenge the provision of subsection (12) establishing the victim's age (under fourteen years old) as a

28

predicate factor.  The Commonwealth clearly has a rational basis to protect its children from murder and to assign the death penalty as a deterrent and appropriate punishment.  While no Virginia case has addressed the factor of the victim's age in a capital murder context under an equal protection analysis, other courts have done so and uniformly found a rational basis exists for that legislative choice.  "[T]he Legislature is justified in drawing a line between younger and older children."  Henderson, 962 S.W.2d at 562; see also Cox v. Norris, 133 F.3d 565, 571 (8th Cir. 1997) (confirming that a statute making it a capital crime to "knowingly causing the death of a person under the age of fourteen" sufficiently narrowed the class of those eligible for the death penalty and satisfied constitutional scrutiny); State v. Smith, 974 P.2d 431, 441 (Ariz. 1999) (holding "the age of a victim is an appropriate aggravating factor because a rational basis exists for it").

Gray does challenge the distinction made by the predicate factor of the defendant's age under Code § 18.2-31(12) which separates child murderers who are eighteen, nineteen and twenty years old from those who are twenty-one and older for application of the death penalty.  We analyze Gray's argument under the rational basis principle that "if any state of facts reasonably can be conceived that would sustain the necessity for the legislation and the reasonableness of its classifications,

that state of facts at the time of the legislative enactment must be assumed."  Willis v. Mullett, 263 Va. 653, 659-60, 561 S.E.2d 705, 709-710 (2002).

In its pre-trial response to Gray's motion to declare Code § 18.2-31(12) unconstitutional on equal protection grounds, the Commonwealth posited two bases for the legislature's rational formulation of Code § 18.2-31(12) to encompass only the older offenders.  First, by covering only those offenders age twenty-one or older, the application of the death penalty would be limited to those defendants who "by their very age [are] held to be more responsible for their actions."  Second, the Commonwealth also advanced as a rational basis that "the legislature has legitimately limited the death penalty to those defendants who have a decreased peer relationship with the child victim and thus an increased predatory relationship."

While there may be other grounds upon which Code § 18.2-31(12) could be found to foster a legitimate governmental purpose and would meet a rational basis standard, Gray has failed to show that the foregoing grounds advanced by the Commonwealth do not meet the rational basis requirement. Although it could be argued as a matter of public policy that the age distinction between older and younger child murderers should be different or eliminated, that is a choice in our constitutional system for the legislative branch of government.

30

Carter v. Carter, 232 Va. 166, 171-72, 349 S.E.2d 95, 98 (1986) ("[T]he drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. The burden rests on the party challenging the statute's validity to show the legislature acted irrationally, and the Court may not substitute its own judgment for a legislative determination that has some rational basis." (internal quotation marks and citation omitted)). Upon judicial review, our role is only to ascertain that a rational basis exists for the challenged distinction, not whether it is the best or only choice. Cox Cable Hampton Roads v. City of Norfolk, 247 Va. 64, 67, 439 S.E.2d 366, 367-68 (1994) (reviewing an equal protection challenge under rational basis review); see City of Portsmouth v. Citizens Trust Co., 216 Va. 695, 698, 222 S.E.2d 532, 534 (1976) ("It is not necessary that legislative classifications be perfect, and a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.").

Other criminal statutes in Virginia distinguish between criminal defendants based either on age alone or the age differential between the victim and the defendant. For example, Code § 18.2-63 distinguishes between a sixteen year old defendant who has carnal knowledge of a thirteen year old victim (a Class 6 felony) and a sixteen year old defendant who has

31

carnal knowledge of a fourteen year old victim (a Class 4 misdemeanor), all depending on whether a gap of three years or more exists between the age of the victim and the defendant. Similarly, the enhanced penalty under Code § 18.2-255 for a defendant convicted of drug distribution to a child applies if a twenty-one year old distributes to a sixteen year old, but does not apply if an eighteen year old distributes the same drugs to the same sixteen year old. Although both defendants in the foregoing example are adults, there is a rational basis for the legislative distinction of penalties for the same criminal act both because the older defendant could be deemed more responsible for his actions by virtue of his age and because of the decreased peer relationship with the child victim: the same grounds tendered by the Commonwealth in the case at bar.

Other Virginia statutes provide rationally based distinctions between similarly situated adults. A twenty-one year old commits no crime by purchasing an alcoholic beverage, but a twenty year old commits a class one misdemeanor if that individual makes such a purchase. Code § 4.1-305. A person twenty-one years or older does not commit a crime solely on the basis of operating a motor vehicle or personal watercraft after consuming alcohol. Code § 18.2-266.1 and Code § 29.1-738.02. However, a twenty year old person who does so is guilty of a crime. Id.

As the foregoing examples reflect, the General Assembly has distinguished between criminal defendants based on both the age of the defendant and the span in age between a victim and the defendant. Such choices are peculiarly within the province of the legislature. We cannot say any of these distinctions lack a rational basis as the General Assembly could reasonably determine that older defendants should be more harshly punished because their age reflects a greater degree of maturity and responsibility for their actions and as a deterrent to crime based on a defendant's decreased peer relationship to a victim. These distinctions are no less valid as to Code § 18.2-31(12).

Courts in other states, all applying a rational basis standard of review, have examined statutes making age distinctions among adult criminal defendants committing the same act and determined that no equal protection violation exists.[12]

_____

[12] See State v. Walborn, 729 So. 2d 504 (Fla. Ct. App. 1999) (upholding under rational basis scrutiny a statute making it a crime for a person 24 years or older to engage in sexual activity with a person 16 or 17 years of age); State v. Munz, 355 N.W.2d 576, 585 (Iowa 1984) (upholding under rational basis scrutiny a sexual abuse statute which prohibited a person six or more years older than the victim from having sexual contact with a victim who is 14 or 15 years of age); State v. Elam, 273 S.E.2d 661, 665 (N.C. 1981) (refusing to apply strict scrutiny and upholding under rational basis grounds the constitutionality of an indecent liberties statute against an equal protection challenge when the statute required the defendant be over 16 years of age and also a five year difference between the age of the defendant and the age of the victim, who must be less than 16); People v. Prainito, 410 N.Y.S.2d 772, 773-74 (N.Y. Sup. Ct. 1978) (upholding on rational basis grounds a third degree rape

The Supreme Court of Iowa in State v. Drake, 219 N.W.2d 492

(1974) analyzed an equal protection claim analogous to Gray's

concerning an Iowa statute which fixed the crime of statutory

rape to encompass those acts with a victim age sixteen or

seventeen years old, but only if the defendant was twenty-five

years old or older.  The defendant in Drake contended that the

"unequal treatment of males (those over 25 contrasted with those

25 or under) bears no reasonable relationship to the purpose

sought to be accomplished," 219 N.W.2d at 495, and thus violated

the Equal Protection clause.  The Supreme Court of Iowa

concluded as follows:

> We hold the legislature could reasonably decide that
> men beyond a certain age should have sufficient
> maturity and judgment to be held responsible for
> conduct which might be excusable in a younger person.
> Not all will agree this age should be fixed at 25.
> Sound reasons might be advanced for either side of
> this argument. However, determining the line which
> separates what is criminal from what is not lies
> peculiarly within the sphere of legislative
> discretion, and we have no right to substitute our
> judgment for that of the legislature unless we find
> the classification to be arbitrary, capricious, and
> without reasonable relationship to the purposes of the
> statute.

Drake, 219 N.W.2d at 496.

The rationale of the Supreme Court of Iowa is applicable in

our analysis of Code § 18.2-31(12).  In the context of murder of

statute prohibiting a male 21 years of age or older from
engaging in sexual intercourse with a female less than 17 years
of age).

34

a child, the General Assembly could rationally determine that persons "beyond a certain age should have sufficient maturity and judgment to be held responsible for conduct which might be excusable in a younger person." Drake, 219 N.W.2d at 496. Determining that age and the penalty applicable "lies peculiarly within the sphere of legislative discretion." Id. So too does a decision based on the decreased peer relationship between the defendant and the victim.

Both of the grounds proffered by the Commonwealth present a rational basis for the legislature's direction in Code § 18.2-31(12) that limits the death penalty to defendants age twenty-one or older. As a rational basis exists for the age distinctions established by the General Assembly in Code § 18.2-31(12), Gray's equal protection argument fails. Thus, the circuit court did not err in determining a rational basis exists for Code § 18.2-31(12) and that the statute does not violate the Equal Protection Clause.

### C. Constitutionality of Death Penalty Statutes

Gray challenges the constitutionality of Virginia's capital murder and death penalty statutes. The arguments Gray raises in support of his claims have previously been considered and rejected by this Court. Finding no reason to alter or revisit

our expressed views on these issues, we adhere to our previous

holdings and reject the following claims.

(1)  The vileness aggravating factor provides no meaningful instruction to help avoid the arbitrary and capricious imposition of the death sentence by the sentencing body. Rejected in Juniper v. Commonwealth, 271 Va. 362, 388, 626 S.E.2d 383, 401, cert. denied, 549 U.S. ___, 127 S.Ct. 397 (2006); Morrisette v. Commonwealth, 264 Va. 386, 397, 569 S.E.2d 47, 55 (2002), cert. denied, 540 U.S. 1077 (2003); Williams v. Commonwealth, 248 Va. 528, 535, 450 S.E.2d 365, 371 (1994), cert. denied, 515 U.S. 1161 (1995).[13]

(2)  The vileness aggravating factor is unconstitutionally vague.  Rejected in Wolfe v. Commonwealth, 265 Va. 193, 208, 576 S.E.2d 471, 480, cert. denied, 540 U.S. 1019 (2003) and Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, 522 U.S. 1018 (1997).

(3)  The definitions of "depravity of mind" and "aggravated battery" are meaningless and unconstitutionally vague. Rejected in Sheppard v. Commonwealth, 250 Va. 379, 394, 464 S.E.2d 131, 140 (1995), cert. denied, 517 U.S. 1110 (1996) ("depravity of mind") and Mickens v. Commonwealth, 247 Va. 395, 403, 442 S.E.2d 678, 684, vacated and remanded on other grounds, 513 U.S. 922 (1994) ("aggravated battery").

### III. CONCLUSION

Upon review of the record and upon consideration of the

arguments presented, we find no reversible error in the judgment

---

[13] To the extent Gray is arguing that the circuit court erred by failing to give additional instructions to the jury on the meaning of the vileness factor, our review of the record shows that Gray never raised such an objection at trial.  In fact, the jury instructions were offered upon agreement by the parties without objection.  Gray never argued in the circuit court that the instructions as given were defective in any way. Gray also failed to offer an additional instruction on vileness to the circuit court, which Gray conceded during oral argument before this Court.  For these reasons, we hold that Gray has waived this argument.  Rule 5:25.

36

of the circuit court.  Furthermore, we find no reason to commute or set aside the sentences of death.  We will therefore affirm the judgment of the circuit court including the sentences of death.

**Affirmed**.
